972 F.2d 1511
 20 Media L. Rep. 1649
 Richard P. CRANE, Jr.; James D. Henderson, Plaintiffs-Appellants,
v.
THE ARIZONA REPUBLIC; Jack Anderson; Jerry Vann, aka Jerry
Van Hoorelbeke; Jerry Seper; Darrow Tully; Alan
Moyer; Phoenix Newspapers, Inc.,
Defendants-Appellees.
 No. 90-55071.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 8, 1991.
Submission Deferred Aug. 16, 1991.
Resubmitted Aug. 13, 1992.
Decided Aug. 21, 1992.
 
 Margaret M. Morrow, Quinn, Kully and Morrow, Los Angeles, Cal., for plaintiffs-appellants.
 Paul F. Eckstein, Brown & Bain, Phoenix, Ariz., for defendants-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before TANG, REINHARDT, and WIGGINS, Circuit Judges.
 TANG, Circuit Judge:
 
 
 1
 In August 1984, The Arizona Republic published an article describing an ongoing investigation by a congressional committee and the Department of Justice into alleged corruption by James Henderson and Richard Crane, Jr., the then current and former heads, respectively, of the Justice Department's Los Angeles Organized Crime and Racketeering Strike Force ("Strike Force"). Crane and Henderson subsequently filed a lawsuit in California state court seeking damages for libel, slander, and intentional infliction of emotional distress. The state court denied the defendants' motion for summary judgment. The defendants removed the case to federal court and filed a second motion for summary judgment, which was granted. Crane and Henderson appeal. We affirm in part, and vacate and remand in part.
 
 BACKGROUND
 
 2
 In the spring of 1983, the U.S. House of Representatives' Select Committee on Narcotics Abuse and Control ("Committee") received allegations of corruption by Henderson and Crane. Crane, a private attorney, had previously headed the Strike Force for thirteen years. Henderson, a friend and former colleague of Crane, was at the helm of the Strike Force at the time the charges of corruption arose.[1] The charges were levelled by Jerry Vann, an incarcerated felon enrolled in the federal witness protection program. Vann had previously served as a successful witness in numerous Strike Force investigations and prosecutions.
 
 
 3
 Vann claimed that Crane and Henderson had ties to organized crime and that this linkage underlay the dismissal of numerous meritorious criminal cases by the Strike Force. Vann also alleged that Crane's current clients were organized crime figures and that Crane used his friendship with Henderson to halt Strike Force investigations of his clients. Vann referred specifically to the government's failure to prosecute an alleged Hawaiian crime chief, who was the target of two separate criminal investigations (Operations Fireball and CoCo). Vann attributed the lack of prosecution to the efforts of Henderson, Crane, and others.
 
 
 4
 After receiving these allegations, Representative Charles Rangel, Chair of the Committee, and Representative Benjamin Gilman, asked Sterling Johnson, Jr. to conduct a preliminary investigation into Vann's charges and to recommend whether further investigation would be worthwhile.[2]
 
 
 5
 After interviewing Jerry Vann and others Vann named to corroborate his charges, Johnson summarized his findings for the Committee. He began by describing Vann's criminal background, history of cooperation with prosecutors, and his subsequent feeling of betrayal by them. Johnson then recited Vann's main allegations:
 
 
 6
 (1) Crane supervised the Strike Force for thirteen years.
 
 
 7
 (2) Crane is currently the attorney for the Aladdin Hotel Casino in Las Vegas and owns "points" in the Barbary Coast Casino.
 
 
 8
 (3) Vann stated that "Crane's clients are organized crime figures. When Crane's clients have problems with the Los Angeles Strike Force, they are rarely touched because the current Chief (Jim Henderson) is a friend and former subordinate of [Crane's]."
 
 
 9
 (4) Vann described Henderson as a personal friend of Crane. Vann characterized Henderson as "unusually soft on organized crime and corruption." Vann cited alleged corruption by Governor Jerry Brown and George Deukmejian as examples of Henderson's softness on corruption.
 
 
 10
 (5) Vann stated that the Strike Force had jurisdiction over Hawaii.
 
 
 11
 (6) Vann submitted documents to Johnson intended to corroborate his story.
 
 
 12
 Johnson also talked with Chris Harris, an Alcohol, Tobacco, and Firearms Agent, and with George Cooper, a member of the Los Angeles Arson Task Force. Harris disagreed with Vann's claim that the Strike Force was corrupt, although he did label "unusual" the Strike Force's delays in prosecutions.
 
 
 13
 Cooper, according to Johnson, "appeared to really want to 'open up' " but would not do so in front of Harris. Cooper reportedly was quite upset when he discussed an investigation he completed in which the Strike Force delayed four years in obtaining an indictment.
 
 
 14
 Hal Glickman, a former bail bondsman, confirmed for Johnson that a major organized crime figure had some Strike Force personnel "in his pocket."
 
 
 15
 Ron Cohen, a prosecutor for Los Angeles's own strike force, told Johnson that he knew "of no personal improprieties in the Federal Strike Force."
 
 
 16
 Mark Schorr, a reporter, advised Johnson that "there is probably something to many of Vann's allegations."
 
 
 17
 After reviewing Johnson's report, John Cusack (Chief of Staff of the House Committee), Representative Rangel, and Johnson all agreed that the allegations were credible and warranted a full investigation. In November 1983, Representative Rangel wrote a letter to United States Attorney General William French Smith on behalf of the Committee. The letter described the Committee's investigation and Vann's allegations. As Chair of the Committee, Representative Rangel "strongly urge[d]" the Attorney General "to undertake a vigorous investigation" of the matter.
 
 
 18
 Less than two weeks after receiving the Committee's letter, the Justice Department commenced an investigation into the charges. The Committee also continued its own investigation. In January 1984, the Committee sent its Chief Counsel, Richard Lowe III, and a staff investigator, John Capers, to Hawaii to interview Donald Carstensen, an investigator for Honolulu's organized crime task force. In their report, Lowe and Capers stated that "Officer Carstensen substantiated the allegations of Jerry Vann." Officer Carstensen also complained about numerous dismissals of cases against alleged organized crime figures by the local U.S. Attorney's Office and the state Attorney General. Lowe and Capers both believed that the Strike Force had jurisdiction over or played some role in Operations Fireball and CoCo in Hawaii. A letter written by Lowe to the Justice Department revealed that the Committee believed this new information "reinforced the allegations made by Mr. Vann."
 
 
 19
 In June 1984, Vann contacted Jerry Seper, a reporter for The Arizona Republic. Vann advised Seper of his allegations concerning corruption in the Strike Force. Vann provided Seper with copies of Johnson's report, a November 1983 letter from the Justice Department to the Committee confirming that it would investigate the charges, and a case report by Capers. During his discussion of the allegations, Vann told Seper that he thought Crane and Henderson both were "unusually soft" on organized crime and that the two prosecutors were friends or associates of certain organized crime figures.
 
 
 20
 Seper subsequently received from a confidential source at the Committee copies of Chair Rangel's letter to the Justice Department and a report on the Carstensen interview. Committee Chief of Staff Cusack confirmed the authenticity of these reports. Cusack also stated that "We wouldn't have taken the trouble to write the letter [to the Justice Department] if we didn't think there was a problem. We just don't write letters like that every day."
 
 
 21
 Seper contacted James Henderson on June 10, 1984. Henderson denied the charges and denied any knowledge of the Committee's investigation. He told Seper that the Strike Force had no jurisdiction over Hawaii. Henderson also submitted documents that he believed would expose Vann's allegations as untrue. Although Seper told Henderson he would delay publishing his article until he reviewed these materials, Seper published without reading them. Seper also told Henderson that he was considering doing a story on how such "outrageous allegations" could be made to a congressional committee.
 
 
 22
 Seven weeks later, Seper spoke with Crane who likewise denied the allegations and labelled Vann "a kook." Crane claimed to have documents that could disprove Vann's allegations. As Henderson had done, Crane advised Seper that the Strike Force had no jurisdiction over Hawaii. According to Crane, Seper admitted he had doubts about the veracity of Vann's charges and agreed to review Crane's records prior to publishing. Seper, however, published without reviewing Crane's documents.
 
 
 23
 Seper's article was published in The Arizona Republic on August 1, 1984, under the headline U.S. Crime Strike Force in L.A. Accused of Corruption. The article relied on allegations and statements made in the Committee's documents and on statements made by Crane, Henderson, and other persons involved in the investigation.
 
 
 24
 In July 1985, Crane and Henderson filed a libel action in California state court against The Arizona Republic, Seper, and others involved in the publication (collectively, "The Arizona Republic "). In April 1987, The Arizona Republic moved for summary judgment, which was denied. In August 1988, The Arizona Republic removed the case to federal district court and again requested summary judgment, which the district court granted. 729 F.Supp. 698 (1989).[3]
 
 
 25
 The district court granted summary judgment for The Arizona Republic because the article was absolutely privileged under Cal.Civ.Code § 47(4).[4] With respect to Henderson, the district court alternatively grounded its dismissal on the lack of clear and convincing evidence of actual malice. As an active, high-level prosecutor at the time of publication, Henderson qualified as a public official, thereby activating the rigorous standard of proof mandated by New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The district court concluded that Crane did not qualify as a public official because he was in private practice at the time the article came out and because the charges focused on his activities as a private lawyer.
 
 
 26
 Henderson and Crane filed a timely notice of appeal to this court.
 
 STANDARD OF REVIEW
 
 27
 We review de novo the district court's grant of summary judgment. Kruso v. International Tel. & Tel. Corp., 872 F.2d 1416, 1421 (9th Cir.1989), cert. denied, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). In the First Amendment context, the particular question presented by a summary judgment motion is "whether the evidence in the record could support a reasonable jury finding ... that the plaintiff has shown actual malice by clear and convincing evidence." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255-56, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). In other words, in determining whether a genuine factual issue exists in this case, we "must bear in mind the actual quantum and quality of proof necessary to support liability under [the] New York Times [standard]." Id. at 254, 106 S.Ct. at 2513. We "must make an independent examination of the whole record" in order to protect the right of free expression. New York Times, 376 U.S. at 285, 84 S.Ct. at 729 (internal quotation omitted).
 
 
 28
 Whether a report of the Committee's investigation falls under Cal.Civ.Code § 47(4)'s umbrella is a question of statutory interpretation and is thus subject to de novo review. See Home Sav. Bank, F.S.B. v. Gillam, 952 F.2d 1152, 1156 (9th Cir.1991).
 
 
 29
 The parties argue over whether application of the "fair and true" aspect of section 47(4)'s privilege is a question of law or of fact. We have recently ruled that when, as here, there is no dispute concerning the contents of either the governmental materials relied upon or the article itself, whether an article is "fair and true" is a question of law. Dorsey v. National Enquirer, Inc., 952 F.2d 250, 254 (9th Cir.1991). As a question of law, the district court's ruling is subject to de novo review in this court. See United States v. McConney, 728 F.2d 1195, 1201 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).
 
 
 30
 Whether a plaintiff qualifies as a public official is a question of law to be afforded de novo review. Rosenblatt v. Baer, 383 U.S. 75, 88, 86 S.Ct. 669, 676, 15 L.Ed.2d 597 (1966); see Kruso, 872 F.2d at 1421. Whether the evidence in the record is sufficient to permit the question of actual malice to go to a jury is a question of law that we review de novo. See Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 685, 109 S.Ct. 2678, 2694, 105 L.Ed.2d 562 (1989).
 
 DISCUSSION
 I. Cal.Civ.Code § 47(4)
 California Civil Code § 47(4) provides:
 
 31
 A privileged publication or broadcast is one made
 
 
 32
 * * *
 
 
 33
 * * *
 
 
 34
 4. By a fair and true report in a public journal, of (1) a judicial, (2) legislative, or (3) other public official proceeding, or (4) of anything said in the course thereof, or (5) of a verified charge or complaint made by any person to a public official, upon which complaint a warrant shall have been issued.
 
 
 35
 Crane's and Henderson's argument against the district court's application of section 47(4)'s privilege takes two distinct tacks. First, they question whether a legislative investigation qualifies as a "public official proceeding" within the meaning of section 47(4)(3). Second, they dispute on five grounds the district court's determination that the article was "fair and true."
 
 A. Public Official Proceeding
 
 36
 Crane and Henderson argue that the Committee's investigation does not qualify as a "public official proceeding" because it was not open to the public.
 
 
 37
 We disagree. Section 47(4) specifically extends its aegis to reports of "legislative" proceedings. Cal.Civ.Code § 47(4)(2). Nothing in the language of the statute limits the privilege to legislative proceedings open to the public.[5] Furthermore, Henderson and Crane do not dispute on appeal the district court's determination that the Committee itself (as opposed to a few isolated Representatives) conducted the investigation into Vann's charges.
 
 
 38
 Cases interpreting the scope of California's reporter privilege suggest, moreover, that this investigation qualifies regardless of whether it is denominated a "legislative" or a "public official" proceeding. In Reeves v. American Broadcasting Cos., 719 F.2d 602, 605-06 (2d Cir.1983), the Second Circuit concluded that a secret grand jury proceeding qualified as a "public official proceeding," within the meaning of section 47(4). In Howard v. Oakland Tribune, 199 Cal.App.3d 1124, 245 Cal.Rptr. 449, 451 (1988), the California Court of Appeal held that a state administrative agency's investigation into the expenditure of public funds fell within the "plain meaning" of "public official proceeding." Internal police investigations also come within section 47(4)'s perimeters. Green v. Cortez, 151 Cal.App.3d 1068, 199 Cal.Rptr. 221, 224 (1984); see also Hayward v. Watsonville Register-Pajaronian and Sun, 265 Cal.App.2d 255, 71 Cal.Rptr. 295, 299 (1968) (police crime reports and FBI identification records constitute "public official proceedings"); cf. Tiedemann v. Superior Court, 83 Cal.App.3d 918, 148 Cal.Rptr. 242, 246-47 (1978) (informer's tip about possible perpetration of tax fraud qualifies as a "judicial proceeding" under Section 47(2)(2)).
 
 
 39
 These cases broadly define the types of proceedings falling within the privilege. In so doing, they recognize the strong public policy concerns infusing the California statute:
 
 
 40
 The fair report privilege is required because of the public's need for information to fulfill its supervisory role over government. Thus, reports of official proceedings are not privileged "merely to satisfy the curiosity of individuals," but to tell them how their government is performing. While the public may not have an overriding interest in knowing the details of every crime committed, its interest in overseeing the conduct of the prosecutor, the police, and the judiciary is strong indeed.
 
 
 41
 McClatchy Newspapers, Inc. v. Superior Court, 189 Cal.App.3d 961, 234 Cal.Rptr. 702, 710 (1987) (quoting Note, When Truth and Accuracy Diverge: The Fair Report of a Dated Proceeding, 34 Stan.L.Rev. 1041, 1049-1050 (1982) (footnotes omitted)).
 
 
 42
 The Reeves court similarly acknowledged section 47(4)'s concern that the citizenry have access to information needed to evaluate and to supervise the performance of governmental officials. "Section 47(4) indicates a policy of dissemination of information in the public interest...." 719 F.2d at 606; see also McCoy v. Hearst Corp., 42 Cal.3d 835, 231 Cal.Rptr. 518, 727 P.2d 711, 727 (1986) ("[T]he press is our citizenry's single most important check on governmental misconduct and secrecy."), cert. denied, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987); accord Tiedemann, 148 Cal.Rptr. at 247 (public policy animating Cal.Civ.Code § 47(2) demands that "doubts as to whether" the section applies "are to be resolved in favor of finding a privilege").
 
 
 43
 The policy concerns voiced in these opinions counsel against straitjacketing the privilege with a narrow interpretation of the terms "legislative" or "public official" proceeding. Citizens cannot monitor their government when it conducts business behind closed doors. As these cases have interpreted the phrase, "public" would appear to mean "governmental" as opposed to private actions. "Official" apparently signifies formal, as opposed to informal, governmental proceedings. This definition reconciles the foregoing cases with the statutory language in a manner that most generously accommodates the public's right to know about the inner-workings of its government.[6]
 
 
 44
 Crane's and Henderson's interpretation, by contrast, would artificially cabin the privilege. Reports of closed-door congressional hearings--which often involve the most pressing issues of the day, such as the Vietnam War, Iran-Contra, and covert activities--would fall outside the privilege.
 
 
 45
 Additionally, Crane's and Henderson's reading of the statute ignores the fact that the California legislature knew how to limit the privilege to proceedings open to the public when it so desired. In section 47(5)(1), the statute expressly confines the privilege to public meetings only "if such meeting[s] [were] ... open to the public." Cal.Civ.Code § 47(5)(1). Of course, if "public" already meant "open to the public," the legislature's careful and conscious addition of language was nothing more than an exercise in redundancy. See United States v. Mehrmanesh, 689 F.2d 822, 829 (9th Cir.1982) (courts should not construe statutes so as to render specific language surplusage).
 
 
 46
 In short, whether we choose to denominate the Committee's investigation a "legislative" or a "public official" proceeding, case precedent, fundamental canons of statutory construction, and policy concerns confirm that the district court did not err in finding section 47(4)'s privilege applicable to this investigation.
 
 B. Fair and True Report
 
 47
 Under California law, a newspaper report is "fair and true" if it captures " 'the substance, the gist, the sting of the libelous charge.' " Hayward, 71 Cal.Rptr. at 300 (quoting Kurata v. Los Angeles News Publishing Co., 4 Cal.App.2d 224, 40 P.2d 520, 522 (1935)). The news article need not track verbatim the underlying proceeding. Only if the deviation is of such a "substantial character" that it "produce[s] a different effect" on the reader will the privilege be suspended. Hayward, 71 Cal.Rptr. at 300. News articles, in other words, need only convey the substance of the proceedings on which they report, as measured by their impact on the average reader. Kilgore v. Younger, 30 Cal.3d 770, 180 Cal.Rptr. 657, 673, 640 P.2d 793, 797 (1982); see also Handelsman v. San Francisco Chronicle, 11 Cal.App.3d 381, 90 Cal.Rptr. 188, 191 (1970) ("If the substantial imputations be proved true, a slight inaccuracy in the details will not prevent a judgment for the defendant, if the inaccuracy does not change the complexion of the affair so as to affect the reader of the article differently than the actual truth would.") (quotations omitted). A "certain degree of flexibility/literary license" is afforded reporters under the privilege. Reader's Digest Ass'n v. Superior Court, 37 Cal.3d 244, 208 Cal.Rptr. 137, 148-49 n. 13, 690 P.2d 610, 621-22 n. 13 (1984), cert. denied, 478 U.S. 1009, 106 S.Ct. 3307, 92 L.Ed.2d 720 (1986). Finally, a reporter need not " 'resolve the merits of the charges' " or " 'present the [plaintiff's] version of the facts' " to invoke the privilege. Reeves, 719 F.2d at 606 (quoting Rollenhagen v. City of Orange, 116 Cal.App.3d 414, 172 Cal.Rptr. 49, 56-57 (1981)).
 
 
 48
 Crane and Henderson challenge the district court's ruling that the article was a fair and true report of the investigation in five particulars.
 
 1. The Claim of Substantiation
 Paragraph 33 of the article reads:
 
 49
 A confidential memo dated Jan. 30 said many of Van[n]'s allegations had been "substantiated" during the committee's secret inquiry. The memo, a copy of which has been obtained by The Republic, outlined an interview with a law-enforcement official in Hawaii, who was described as being knowledgeable about the activities of the Los Angeles-based strike force.
 
 
 50
 The statement that a law enforcement official in Hawaii substantiated Vann's allegations may be traced directly to the Lowe and Capers report that Officer Carstensen "substantiated the allegations of Jerry Vann." While Crane and Henderson insist that this conclusion was erroneous due to Officer Carstensen's limited contact with the Strike Force, they are really arguing with Lowe's and Caper's conclusions, not with the accuracy of The Arizona Republic 's reporting of those conclusions. Cf. McClatchy, 234 Cal.Rptr. at 712 ("This word-for-word account of the ... Report ... can hardly be considered unfair. A verbatim use of the alleged defamatory material reported in its proper context not only presents the gist and sting of the statement, but it epitomizes the meaning of 'fair and true report.' ").
 
 
 51
 Crane and Henderson also object to The Arizona Republic 's statement that Officer Carstensen was "described as knowledgeable" about the Strike Force. While it is true that the Committee's documents do not expressly bestow this label on Officer Carstensen, The Arizona Republic 's conclusion nevertheless captures the gist of these documents. The Committee's decision to send two officials to interview Officer Carstensen implicitly acknowledges the Committee's belief that Carstensen was well acquainted with Strike Force activities. The Committee's reaction to his interview--firing off another letter to the Justice Department stating that Vann's allegations had been reinforced--further attests that the Committee considered the officer to be knowledgeable. Consequently, The Arizona Republic 's characterization of Officer Carstensen as "knowledgeable" simply summarized the Committee's faith in his testimony. See Dorsey v. National Enquirer, Inc., 17 Med.L.Rptr. (BNA) 1527, 1530 (C.D.Cal.1990) (newspaper's interpretation of affidavit privileged because it "is merely elaborating on what the affidavit already alleges.... [T]he defamatory impact ... is the same."), aff'd, 952 F.2d 250 (9th Cir.1991); Reader's Digest, 208 Cal.Rptr. at 149-50, 690 P.2d at 622-23 (slight exaggeration in description of plaintiff's success at drug rehabilitation "falls within an acceptable range of literary license"); Handelsman, 90 Cal.Rptr. at 190-91 (translation of legal term "conversion" into lay person's language as "theft" does not exceed scope of literacy license).
 
 
 52
 Moreover, from the audience's perspective, use of the phrase "knowledgeable" did not significantly alter the paragraph's content. The average reader would expect that substantiation would come from someone the Committee deemed knowledgeable. Cf. Jennings v. Telegram-Tribune Co., 164 Cal.App.3d 119, 210 Cal.Rptr. 485, 489 (1985) (attributing tax fraud and tax evasion charges to a tax misdemeanant, though "perhaps overblown or exaggerated," still privileged because impact on reader is the same given other facts in the article).
 
 
 53
 We thus hold that the district court did not err in maintaining the privilege despite The Arizona Republic 's independent characterization of the evidence.
 
 2. Case Dismissals
 Paragraph 34 of the article reads:
 
 54
 The official, Donald Carstensen, an investigator with the Honolulu city prosecuting attorney's office, was quoted by committee investigators as saying he was "concerned and shocked" by the number of "strong cases" that had been dismissed by strike-force attorneys in Los Angeles.
 
 
 55
 Crane and Henderson object to The Arizona Republic 's statement that Strike Force attorneys dismissed these cases. Officer Carstensen stated that the U.S. Attorney's office--not the Strike Force--ordered the dismissals. Crane and Henderson argue that this shift in responsibility for case dismissals exceeded the bounds of literary license.
 
 
 56
 We hold that this deviation from the reports does not merit reversal for three reasons. First, Henderson and Crane apparently did not raise this issue below, as the district court did not pass upon it. Because this is a civil case, we need not consider an issue raised for the first time on appeal. Bolker v. Commissioner, 760 F.2d 1039, 1042 (9th Cir.1985).
 
 
 57
 Second, while the Committee documents do not expressly saddle the Strike Force with responsibility for the dismissals, a fair reading of the documents, against the backdrop of Officer Carstensen's allegations and the Committee's reliance on him, suggests that Henderson and Crane influenced in some manner the decision to dismiss the cases. The dismissals, after all, arose out of Operations Fireball and CoCo, operations in which the Committee believed the Strike Force was involved. Thus the conclusion that Henderson and Crane influenced the dismissals would not constitute a material deviation from the gist or substance of the Committee's investigation. Cf. Time, Inc. v. Pape, 401 U.S. 279, 288-90, 91 S.Ct. 633, 638-40, 28 L.Ed.2d 45 (1971) (omission of word "alleged" in front of claims of police brutality did not so materially alter substance of article as to support finding of malice).
 
 
 58
 Third, a distinction between the U.S. Attorney's Office and the Strike Force would be of little significance to the average reader. The import and sting of the article--that high-level prosecutors were suspected of being in cahoots with organized crime--remains unaffected by the word choice. The test is how the word change affects the average reader, not the average lawyer. "The report is not to be judged by the standard of accuracy that would be adopted if it were the report of a professional law reporter or a trained lawyer." Handelsman, 90 Cal.Rptr. at 191 (translating charge of "civil conversion" to "theft" does not abrogate the privilege); see also Jennings, 210 Cal.Rptr. at 489 (privilege obtained even though newspaper described plaintiff's plea to misdemeanor failure to file tax returns as "tax fraud" and "tax evasion," because "[t]he gist or sting of the articles is that Jennings was convicted ... [of] several serious tax crimes").
 
 3. Soft on Crime
 
 59
 In paragraphs 7 and 9 of the article, The Arizona Republic reported:
 
 
 60
 Van[n] told the committee that Henderson and Crane were "unusually soft on organized crime and corruption" and testified that he knew of instances in which the two men avoided prosecuting certain organized-crime figures operating in the strike force's five-state region, which encompasses Arizona, California, Nevada, Hawaii and New Mexico.
 
 
 61
 * * *
 
 
 62
 * * *
 
 
 63
 Van[n] described the crime figures, including high-profile drug dealers and members of the Israeli Mafia, as "friends or associates" of the two prosecutors. He said Crane, who retired in 1977 after 13 years as head of the strike force, currently works for "the Las Vegas mob" and is involved in gambling interests in Nevada.
 
 
 64
 Henderson and Crane argue that the use of quotations around the statements that they were soft on organized crime and that Mafia members were their friends and associates misleads the reader into believing that these assertions appeared verbatim in the Committee's documents. In fact, these statements are The Arizona Republic 's paraphrase of comments gleaned from the official reports.
 
 
 65
 We deny relief on this basis for three reasons. First, while the quotes did not appear in the Committee documents, they accurately convey the gist and substance of Vann's accusations against both Henderson and Crane. The appearance or not of quotation marks did not substantially alter the reader's understanding of Vann's allegations. Consequently, the statements remain cloaked by the privilege. See, e.g., Reader's Digest, 208 Cal.Rptr. at 148-49 n. 13, 690 P.2d at 621-22 n. 13; Jennings, 210 Cal.Rptr. at 489.
 
 
 66
 Second, by way of analogy, the Supreme Court recently ruled that malice may not be inferred from the deliberate fabrication of quotation marks if the use of quotations does not alter the substantive content of remarks actually made. Masson v. New Yorker Magazine, Inc., --- U.S. ----, ----, 111 S.Ct. 2419, 2433, 115 L.Ed.2d 447 (1991) (the "use of quotations to attribute words not in fact spoken" does not evidence knowledge of falsity under the New York Times test "unless the alteration results in a material change in the meaning conveyed by the statement"). As noted, these quotations accurately convey the essence of Vann's charges.
 
 
 67
 Third, while not derived from Committee documents, the quoted allegations represent statements actually made by Vann in an interview with the reporter during his preparation of the story. Statements made by persons substantially involved in a privileged proceeding, pertaining directly to the issues covered by that proceeding and made in the course of the proceeding, fall within the privilege's compass. Cal.Civ.Code § 47(4)(4); see Reeves, 719 F.2d at 606; Dorsey, 17 Med.L.Rptr. at 1530 ("Section 47(4) applies to anything said in the course of a judicial proceeding."); Hayward, 71 Cal.Rptr. at 299 (oral statements of law enforcement officials fall within privilege).
 
 4. Omissions
 
 68
 Henderson and Crane argue that the article is not fair and true because it failed to publish some of the exculpatory material in the Committee's possession and of which The Arizona Republic was aware. Crane and Henderson cite specifically the omission of statements undercutting Vann's credibility.
 
 
 69
 We decline Crane's and Henderson's invitation to reverse on this ground. While the article did not exhaustively present all of the evidence favorable to Henderson and Crane, it did report their denials of wrongdoing and it did inform the reader that the Committee's star witness was a convict with a rich criminal history. The Arizona Republic 's invocation of the privilege is not conditioned upon its presentation of the plaintiffs' version of the facts. See Rollenhagen, 172 Cal.Rptr. at 56-57. Because the omissions did not materially alter the tenor of the story, the privilege applies.
 
 
 70
 The focus of the article, it should be remembered, was that the Committee was investigating charges of corruption. The merits of the underlying debate were of secondary concern. "What is newsworthy about such accusations is that they were made" by the Committee. Edwards v. National Audubon Soc'y, 556 F.2d 113, 120 (2d Cir.), cert. denied, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977).
 
 
 71
 5. The Juxtaposing of Crane's and Henderson's Denials
 
 
 72
 Henderson's and Crane's final and most substantial argument challenges the district court's ruling that The Arizona Republic 's juxtaposing of their denials was nonactionable.
 
 Paragraphs 18-20 of the article read:
 
 73
 Crane said he and Henderson talked about the allegations, the House request for an investigation and the Justice Department probe of them. He said Henderson told him Van[n] is "a kook."
 
 
 74
 Henderson, however, told The Republic he was not aware that specific allegations have been made against him, Crane or the strike force, that he had not talked to Crane about them and that he did not know that the House committee had requested an investigation by the Justice Department.
 
 
 75
 "This is all news to me," he said.
 
 
 76
 Henderson and Crane argue that the collocation of these two paragraphs demonstrates that the article is not "fair and true."
 
 
 77
 The Arizona Republic, while denying any calculated effort to make the denials contradictory, does not dispute that the apparent inconsistency is wholly attributable to the timing of the reporter's phone calls. The reporter spoke with Henderson in early June and with Crane in late July. Henderson and Crane had conferred in the interim. This explanation of why the two statements sound contradictory was omitted from the article.
 
 
 78
 Crane and Henderson contend that the juxtaposing of their denials abrogates the "fair and true" privilege because the editing falsely conveyed the message that either Crane or Henderson lied to the reporter.[7]
 
 
 79
 We agree that the juxtaposing claim is not immunized under Cal.Civ.Code § 47(4). In light of the evidence in the record, we cannot rule, as a matter of law, that this portion of the article is "fair and true."[8]
 
 
 80
 A reasonable jury could find that the effect of the juxtaposed denials materially altered " 'the gist, the sting' " of the article. Masson, --- U.S. at ----, 111 S.Ct. at 2433 (quoting Heuer v. Kee, 15 Cal.App.2d 710, 59 P.2d 1063, 1064 (1936)). The effect of this editing cast aspersions on Crane's and Henderson's denials that otherwise would have been absent from the article. By discrediting denials made by the investigation's targets, the article artificially inflates the credibility of Vann and the plausibility of the Committee's suspicions. The change, in other words, could reasonably be expected to affect the average reader's appraisal of the story and evaluation of the merits of the charges. Cf. Murray v. Bailey, 613 F.Supp. 1276, 1285 (N.D.Cal.1985) (where author had seen "hard evidence" rebutting his allegations, question of malice could be submitted to the jury); Westmoreland v. CBS, Inc., 596 F.Supp. 1170, 1174-75 (S.D.N.Y.1984) (jury question presented where editing gives statement a different meaning than it otherwise would have).
 
 
 81
 Furthermore, the district court appropriately rejected The Arizona Republic 's argument that the reporter was confused about the timing of the statements. The reporter's claimed confusion pertained only to the date of the interim meeting. It did not alter the reporter's knowledge that Henderson and Crane truthfully did not confer prior to the reporter's phone call with Henderson, but did speak about the case prior to the reporter's phone call with Crane.
 
 
 82
 In sum, we hold that Crane and Henderson have failed to demonstrate that most portions of the article fall outside the privilege established by Cal.Civ.Code § 47(4) for fair and true reports of legislative or other public official proceedings. We also hold, however, that section 47(4) does not immunize The Arizona Republic from liability on the juxtaposing claim.
 
 II. Actual Malice
 
 83
 The district court ruled, in the alternative, that Henderson, as a public official, failed to establish actual malice on the part of The Arizona Republic. Henderson challenges this ruling on appeal.[9]
 
 
 84
 Because we hold that most of The Arizona Republic article is absolutely privileged under California law, we need not address Crane's and Henderson's arguments that The Arizona Republic 's reliance on Vann, failure to investigate the charges independently, and exclusion of exculpatory material evidenced actual malice. However, because we have ruled that California's journalistic privilege does not preclude Crane and Henderson from pursuing their juxtaposing claim, we must review the district court's ruling that Crane and Henderson lacked evidence of actual malice with respect to this claim.
 
 
 85
 Actual malice is a subjective standard testing the publisher's good faith belief in the truth of her or his statements. St. Amant v. Thompson, 390 U.S. 727, 731-32, 88 S.Ct. 1323, 1325-26, 20 L.Ed.2d 262 (1968). A plaintiff must demonstrate, by clear and convincing evidence, that "the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 511 n. 30, 104 S.Ct. 1949, 1965 n. 30, 80 L.Ed.2d 502 (1984). Malice, in other words, "is not measured by whether a reasonably prudent [person] would have published, or would have investigated before publishing." St. Amant, 390 U.S. at 731, 88 S.Ct. at 1325. Rather, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of [the] publication." Id.
 
 
 86
 The district court ruled that the editorial arrangement of the denials was non-actionable under the incremental harm doctrine. See Masson v. New Yorker Magazine, Inc., 895 F.2d 1535, 1541 (9th Cir.1989), rev'd, --- U.S. ----, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). The district court explained that the impact on the reader of allegations of corruption and collusion with organized crime figures dwarfed any reputational damage worked by the implication that one of them was lying. The court also concluded that the editing of these paragraphs did not demonstrate malice because it did not suggest that either The Arizona Republic or the reporter believed the story about the Committee's investigation to be false.
 
 
 87
 The district court's reliance on the incremental harm doctrine to reject this claim was erroneous. Since the district court's decision, the Supreme Court has ruled that the incremental harm doctrine is not compelled by the First Amendment. Masson, --- U.S. at ----, 111 S.Ct. at 2436. On remand, this court further rejected the argument that the incremental harm doctrine is a part of California state law. Masson v. New Yorker Magazine, Inc., 960 F.2d 896, 898-99 (9th Cir.1992).
 
 
 88
 Because the incremental harm doctrine does not insulate The Arizona Republic from liability under either the First Amendment or California law, we must decide whether Henderson and Crane produced clear and convincing evidence that The Arizona Republic juxtaposed their denials with knowledge of, or in reckless disregard of, the false impression the collocation would produce. We conclude that a reasonable jury could find actual malice by clear and convincing evidence. We therefore vacate the district court's grant of summary judgment and remand for trial on this claim.
 
 
 89
 The Arizona Republic does not deny that, as printed, the order of the denials suggests that either Crane or Henderson is lying. Moreover, the district court found, and we agree, that The Arizona Republic was fully aware of the true timing of the denials. Under these circumstances, a reasonable jury could conclude that the juxtaposing of the denials was undertaken either knowingly or in reckless disregard of the false impression it would produce concerning Crane's and Henderson's own credibility.
 
 
 90
 Indeed, a jury could find that The Arizona Republic 's strategic use of the word "however" intentionally or recklessly set up a contrast between the two paragraphs that made Crane's and Henderson's protestations of innocence ring hollow.
 
 
 91
 Furthermore, as noted earlier in the context of California's "fair and true" privilege, a reasonable jury could find that The Arizona Republic 's editing of these denials materially altered the tenor of the story by tilting the credibility scale against Crane and Henderson and in favor of Vann. See Murray, 613 F.Supp. at 1285; Westmoreland, 596 F.Supp. at 1174-75.
 
 
 92
 In sum, Crane and Henderson came forth with sufficient evidence to permit a reasonable jury to conclude that The Arizona Republic 's juxtaposing of their denials was undertaken either with knowledge or in reckless disregard of the false impression concerning Henderson's and Crane's credibility that would result. Summary judgment on this claim was inappropriate.
 
 III. Crane as a Public Official
 
 93
 Both sides agree that the district court properly labelled Henderson a public official, for purposes of applying the New York Times burden of proof to the juxtaposing claim. The allegations concerned Henderson's performance as a high-level government employee and head of the Strike Force.
 
 
 94
 The district court, however, declined to treat Crane as a public official because the thrust of the article addressed his activities as a private lawyer allegedly representing mob clients.
 
 
 95
 We affirm the district court's ruling that Crane is not a public official, with two qualifications. The bulk of the article addresses allegations that Crane, as a private attorney, exploited his personal contacts with Strike Force personnel to protect his clients from prosecution. The article thus addresses neither Crane's performance of official duties nor any misconduct engaged in while a prosecutor. That Crane's conduct allegedly impacted or influenced prosecutorial policy does not alone suffice to make him a public official. The press cannot, by virtue of the content of their news stories, "create their own defense by making the claimant a public [official]." Hutchinson v. Proxmire, 443 U.S. 111, 135, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979). A public official is a person whose position "would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." Rosenblatt, 383 U.S. at 87 n. 13, 86 S.Ct. at 676 n. 13.
 
 
 96
 Putting aside the allegations of corruption contained in the article, the position of private attorney does not automatically invite public scrutiny. An attorney is not a governmental official, so heightened press scrutiny does not serve a watchdog function.
 
 
 97
 Nor do those entering the legal profession expect to be at the center of the public spotlight. "An individual who decides to seek governmental office," by contrast, "must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case." Gertz v. Robert Welch, Inc., 418 U.S. 323, 344, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974).
 
 
 98
 Finally, unlike governmental officials and public figures, private lawyers do not have that greater accessibility to the press needed to counter defamatory remarks. Id. ("Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements then private individuals normally enjoy."). The policy concerns animating the public official designation thus militate against including private lawyers within its span. See Mosesian v. McClatchy Newspapers, 205 Cal.App.3d 597, 252 Cal.Rptr. 586, 594-95 (1988) (fact that state requires a license to perform a job and regulates an occupation, such as being a lawyer, does not establish public official status), cert. denied, 490 U.S. 1066, 109 S.Ct. 2065, 104 L.Ed.2d 630 (1989).
 
 
 99
 A small portion of the article, however, does speak to Crane's activities as a prosecutor. Paragraph seven reports allegations that "the two men avoided prosecuting certain organized crime figures." For purposes of the charges contained in this paragraph, Crane should be deemed a public official. Murray, 613 F.Supp. at 1279-80 (assistant district attorney is a public official); see Rosenblatt, 383 U.S. at 85, 86 S.Ct. at 676 ("[T]he 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.").
 
 
 100
 The nature of the relief sought by Crane also activates the New York Times standard with respect to his juxtaposing claim. Crane concedes that he suffered no economic damage as a result of the article's publication. He thus seeks only punitive, and perhaps some form of general, damages. A plaintiff must demonstrate actual malice, as that term is defined in New York Times, before punitive damages may be awarded. Gertz, 418 U.S. at 350, 94 S.Ct. at 3012 ("[T]he private defamation plaintiff who establishes liability under a less demanding standard than that stated by New York Times may recover only such damages as are sufficient to compensate him for actual injury.").[10]
 
 CONCLUSION
 
 101
 We affirm the district court's determination that California's reporter privilege covers most aspects of this article. The article concerns a legislative or other official proceeding and, with the exception of the juxtaposing of the denials, was a fair and true report as a matter of law. Only the district court's dismissal of the intentional juxtaposing claim warrants reversal, given Crane's and Henderson's evidence of The Arizona Republic 's awareness or reckless disregard that its editing falsely suggested Crane and Henderson were lying.
 
 
 102
 We further hold that Henderson, as a public official, and Crane, because he seeks punitive damages, are both subject to the New York Times' heightened burden of proof.
 
 
 103
 AFFIRMED IN PART and VACATED and REMANDED IN PART.
 
 REINHARDT, Circuit Judge, concurring:
 
 104
 I join fully in Judge Tang's excellent opinion. I write separately to offer a few additional observations.
 
 
 105
 The first amendment is at the heart of our democratic system of government. It is the most fundamental of our rights and liberties. The first amendment protects good speech and bad speech, truthful speech and false speech, constructive speech and harmful speech, pleas for equality and racist speech. The press, or in current terms, the media, informs the people about our government, about its excesses, its corruption, its unlawful conduct--as well as its virtues and accomplishments. It is essential that the press be given the widest latitude to perform this function, that it not be made timid by concerns over libel actions, that it be free to err without fear of repercussions. To the extent we limit the press's willingness to ferret out governmental misdeeds by subjecting it to liability for its sins, we will inevitably limit the people's access to information they need in order to control their own destiny.
 
 
 106
 Although the courts have rejected an absolutist view of the first amendment and have tolerated some restrictions on speech, they have done so with great caution. Our decision today is but one example. We permit appellants' case to proceed further only because The Arizona Republic 's conduct was truly egregious, and it is worth noting that that description applies to conduct on the part of the newspaper and its reporters that does not serve as a basis for our decision, as well as to conduct that does.
 
 
 107
 It is only the most unusual case in which allegations of governmental corruption may provide the basis for a libel suit. This happens to be one of those highly unusual cases. Had The Arizona Republic simply reported the allegations of wrongdoing, no matter how untrue, and then related the reactions of the public officials or others involved, no matter how irresponsible, there would be no basis for a lawsuit. It is only the subsequent wholly unjustifiable actions described by Judge Tang in the juxtaposition portion of the opinion that warrant an exception in this case.
 
 
 108
 We pay a price for our freedoms. That is the other side of the first amendment. While dishonest public officials are often exposed, honest ones are sometimes pilloried--and driven from office. Matters that individuals might justifiably prefer to keep private are exposed to public view. Not only public officials but their families and friends are adversely affected and made the subject of unfair ridicule or opprobrium. Many good men and women are often reluctant to enter public service. In some instances, the price we pay for our freedoms is high indeed; however, it is necessary that we do so if the first amendment is to flourish.
 
 
 109
 Here, there is a certain irony to the events that underlie the libel action. While I do not judge the merits of the case, it is ironic that the accusations of corruption against two heads of the Strike Force were made by a highly successful former strike force witness now enrolled in the federal witness protection program. Witnesses like Jerry Vann play a critical role in many major criminal prosecutions. Numerous defendants are now in prison because jurors were persuaded of the truthfulness of their testimony.
 
 
 110
 Strike Force witnesses are often not very nice people. Frequently, they are professional criminals. There is a reason for that, of course. Members of a criminal enterprise have the most direct knowledge of the facts necessary to a successful prosecution. If they can be turned, they can provide the evidence that will assure a conviction. Afterwards, by giving these witnesses new identities, prosecutors can use them again--to penetrate other criminal operations. Some, like Jerry Vann, are used in numerous investigations and prosecutions.
 
 
 111
 One of the most important responsibilities of a Strike Force prosecutor is to determine that strike force witnesses, particularly those who are used both in investigations and prosecutions, are truthful--that they are not committing perjury in order to curry favor or obtain benefits. If the prosecutor's evaluation is incorrect, the lives of innocent people may be ruined. Here, two highly respected Strike Force chiefs contend that their reputations are being sullied and their careers jeopardized by the false allegations of one of the Strike Force's more prominent witnesses. If they are correct, as they may well be, someone has seriously erred in assessing Jerry Vann's veracity. If so, there is reason to wonder as to Vann's veracity in other circumstances. One can only hope that if Vann's allegations regarding appellants are false--and there is certainly evidence to that effect in the record--his prior testimony regarding other persons is sufficiently corroborated by independent, credible, and even irrefutable, inculpatory evidence.
 
 
 
 [1]
 The Strike Force has jurisdiction over Southern California, Arizona, and New Mexico. The Strike Force coordinates the efforts of federal, state, and local law enforcement agencies in the fight against organized crime. Crane served as head of the Strike Force from 1973 to 1975. Henderson served as its head from 1978 to 1985
 
 
 [2]
 Johnson was at this time the Special Narcotics Prosecutor for New York City
 
 
 [3]
 The state court's denial of summary judgment did not preclude the federal court from revisiting the issue after removal. Preaseau v. Prudential Ins. Co. of Am., 591 F.2d 74, 79-80 (9th Cir.1979)
 
 
 [4]
 In 1990, the California legislature amended section 47 of the California Civil Code. For our purposes, this amendment effected no substantive change in the scope of the journalist's privilege. It did, however, alter the numbering scheme identifying various sections and subsections of the privilege. For convenience's sake, we will cite to the 1982 version of the statute, which was in effect when The Arizona Republic article was published and when the district court issued its decision
 
 
 [5]
 How secret and confidential these proceedings were is itself an issue. While the Committee did not publicize its activities, none of its documents are stamped "Confidential." Nor did Cusack refuse to confirm the validity of The Arizona Republic 's documents on secrecy grounds. There thus does not appear to have been a concerted and conscious effort to cloister this investigation away from public scrutiny
 
 
 [6]
 Such an interpretation also parallels the meaning of "public official" as a term of art in the First Amendment context. Cf. Rosenblatt, 383 U.S. at 85-87, 86 S.Ct. at 675-77
 
 
 [7]
 Although Crane and Henderson couched their argument before this court on this claim solely in terms of actual malice, we consider them to have implicitly contested the characterization of the article as "fair and true" on the same ground. This is because a finding that the article is not privileged under California law is a necessary prerequisite to any actual malice inquiry. In other word, if the article is privileged under state law, we need never reach the actual malice issue
 
 
 [8]
 The Arizona Republic, of course, may still argue to the jury that this portion of the article is "fair and true." Cf. Dorsey, 952 F.2d at 254
 
 
 [9]
 Presumably Crane joins Henderson's objections because the lack of evidence of actual malice precludes him from recovering punitive damages. See infra p. 1525
 
 
 [10]
 Because neither party contests on appeal the district court's determination that the neutral reportage doctrine does not apply in this case, we do not review that aspect of the district court's decision. See Edwards, 556 F.2d at 120