[Nos. A108129, A108923. First Dist., Div. Four. Dec. 29, 2005.]

ANDREW L. CARVER, Plaintiff and Appellant, v.
BARRY BONDS et al., Defendants and Respondents.

330

COUNSEL

Carleton L. Briggs for Plaintiff and Appellant.

Rogers Joseph O'Donnell & Phillips, Chapman, Popik & White and Merri A. Baldwin for Defendant and Respondent Barry Bonds.

Valerian, Patterson & Stratman, Edward J. Rodzewich and Robert Maltz for Defendant and Respondent Roger Craig.

Levy, Ram & Olson and Karl Olson for Defendants and Respondents Hearst Corporation, Mark Fainaru-Wada and Ulysses Torassa.

OPINION

MUNTER, J.*—Andrew L. Carver sued the Hearst Corporation, which publishes the San Francisco Chronicle newspaper, Chronicle reporters Mark Fainaru-Wada and Ulysses Torassa (the corporation and the reporters are hereafter referred to collectively as the Newspaper), San Francisco Giant Barry Bonds, and former San Francisco 49er Roger Craig for defamation and interference with prospective economic advantage based on statements in a Chronicle article. Plaintiff appeals from the order granting defendants' motions to strike under the anti-SLAPP law (strategic lawsuit against public participation) (Code Civ. Proc., § 425.16, hereafter section 425.16; Appeal No. A108129), and from the order awarding attorney's fees to the Newspaper and Bonds (Appeal No. A108923). We affirm the orders.

## I. BACKGROUND

The article in question was published on December 30, 2002, under the headings *The Sport of Doctoring*, and *It's Proving To Be Big Business To Let The Public Know You're Treating Big-Time Athletes*, and read as follows:

"Not all that long ago, medicine was a word-of-mouth kind of profession. Now, marketing is the name of the game, and there's money to be made by convincing prospective patients you've been enlisted by the best and the brawniest. Even if it's not entirely true.

"Danny Williams' left foot had been bothering him for a while, so he finally decided to have it examined by a specialist. As soon as he walked into

---

*Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

the San Francisco office of Dr. Andrew Carver five years ago, Williams, a fervent 49ers fan, figured his pain would soon vanish.

"He found himself gawking at walls covered with signed pictures of famous athletes—there's Joe Montana!—thanking the podiatrist for taking good care of them. There were 49ers and Warriors and tennis stars such as Andre Agassi, millionaires whose livelihoods were tied directly to their feet.

" 'When I came home, I said to my partner, Oh my God, I can't believe who I got to see, the man who's the 49ers' podiatrist,' Williams said recently. 'I felt so lucky. I couldn't believe I got to see this man, it was like I hit the jackpot.'

"But Williams had not seen a man who at any time had been the 49ers' team podiatrist. In fact, Carver's medical connections to the 49ers had been loose at best, limited primarily to a few weeks during the 1989 season when he fitted several players for foot supports at the team training facility. Soon thereafter, the team asked him not to return.

"Long gone are the days when it was frowned upon for physicians even to advertise; instead, in many ways, medicine has become as much about marketing as any other consumer-driven industry. The 52-year-old Carver represents a cautionary tale in these superstar-obsessed days, a warning to patients of the extent some people will go to align themselves with the rich and famous.

"He's a man who gave some former patients and colleagues the impression he had ongoing and extensive relationships with the 49ers and many other high-profile athletes—although virtually all the work he has done with sports figures has been to fit them for orthotics.

"And if some patients didn't know Carver's ties to the athletes were limited, many also never learned he had amassed an inordinate string of medical malpractice suits, was the subject of more than a dozen (now 22) complaints to the state Medical Board and left at least two medical facilities because of problems related to maintaining malpractice insurance or incomplete reporting of his litigation history.

"Carver also currently is under investigation by the Medical Board, which, according to a state source familiar with the inquiry, is looking into a quality-of-care case and allegations he falsified malpractice insurance documents and lied about his record of lawsuits.

" 'I don't do anything that I don't feel is best for my patients,' Carver said. 'Have I had mistakes over the years? Absolutely. Even Bill Clinton made mistakes.'

"The Allure of Pro Athletes

"For years now, the sporting world has been a fertile ground from which to make sales pitches for just about anything. From mouthwash to cars, from underwear to Viagra, the approach is simple: Connect yourself or your product to the athletes the buying public always dreamed of being, and you've got an edge on the competition.

" 'There's no doubt,' said former 49ers tight end Jamie Williams, 'if you work for the Niners, if you deliver food for the Niners, if you deliver mail for the Niners, wash the windows at the Niners facility, that's a big deal.'

"Now, doctors, hospitals and health care networks are finding ways to make those valuable sports associations, hoping they can lure weekend warriors to their offices and clinics with this basic message: If Barry Bonds entrusts his precious and valuable body to me, you certainly can, too.

"Four years ago, Catholic Healthcare West (CHW) figured the link was valuable enough to sign a 10-year, $15 million deal that made it the official health care provider of the Giants.

" 'Unfortunately, I think we're getting to the situation to where health care is becoming just like (selling) beer,' said Giants head trainer Stan Conte, who acknowledged being wary of doctors essentially paying for the right to treat athletes but who also said the CHW deal has worked exceptionally well for all parties.

"Many have argued, even some with CHW, that the partnerships haven't reaped huge dividends for the providers making pacts with the teams. But on the individual level, there is little doubt of the potential payoff derived from treating or saying you treated a high-profile athlete.

" 'I once knew a doctor (from another state) who used to buy autographs of sports figures to put upon his wall. He said to me, "Patients love it because they think I'm taking care of the stars," ' said Dr. Glenn Pfeffer, a local orthopedic surgeon who emphasized that the vast majority of doctors are upstanding and of high quality. 'The key is just to have people do their research. In this country, we find out more about what's in a box of cereal than we do about the credentials of our doctors.'

"In Carver's case, patients and colleagues often found a charming, good-looking doctor with star power, a podiatrist who has boasted of his 100 percent success rate and who was not afraid to tout the medical relationships he said he had with local teams and athletes.

" 'You didn't know he was the podiatrist for the 49ers?' a surprised medical professional who worked often with Carver until a few years ago asked a Chronicle reporter. 'He treated the 49ers for a long while.'

"Asked what gave him that impression, the person said, 'I either heard it or I heard him say it.'

"Carver said he never told anyone he was the 49ers' podiatrist.

" 'I never put a picture on the wall of somebody I didn't treat,' said Carver, who said most of the signed photos on his walls specifically cited his providing insoles. 'When I say treat, I'm not saying I performed bone reconstructive surgery on those people.'

"Wall of Fame

"Bonds. Montana. Jerry Rice. Ronnie Lott. Roger Craig. Chris Mullin. Tim Hardaway. Mitch Richmond. Latrell Sprewell. And more.

" 'This is really a small portion,' Carver said of a list of his sports clients he showed to The Chronicle, later mentioning several other athletes, including Agassi and fellow tennis players Pete Sampras and Michael Chang.

"Sampras and Chang, through spokespersons, said they had no memory of Carver.

"Montana and Mullin, the former Warriors star, declined comment. Hardaway said Carver fitted him for orthotics while he played for Golden State.

"Former 49ers running back Craig, who said he never had problems with his feet or ankles, had no memory of Carver and said, 'I would remember him, trust me, if I had a relationship with him.'

"There are more than 13,000 active podiatrists in the United States, and they receive more than 60 million visits per year from people with foot problems, according to the American Podiatric Medical Association. Podiatrists provide nearly 40 percent of all foot care annually, with treatments ranging from conservative care to complicated surgery.

"In Carver's case, he was certified to perform surgery on the foot and ankle, and several former employees said surgical procedures were a significant part of his practice. So when Danny Williams and other patients went to see Carver either in need of surgery or ultimately were advised by Carver to have it, they quickly were reassured by the scene at his office. If Montana or Rice or Mullin or Agassi entrusted this man with their feet, they reasoned, then surely he was top-notch.

"Katherine Thoresen went to see Carver in the summer of 1998 after hearing him on a weekend radio show hosted by fitness personality Joanie Greggains. That public forum plus the walls covered with pictures of sports stars 'influenced my whole perception,' said Thoresen, of Redwood City.

"Two surgeries and a year-and-a-half later, Thoresen filed a formal complaint with the state Board of Podiatric Medicine (BPM), an affiliate of the Medical Board. In it, she said Carver was 'single-handedly responsible for more grief, anxiety, pain, and discomfort than all previous experiences with my feet combined.'

"That complaint was investigated and referred to the attorney general's office, according to Jim Rathlesberger, executive officer of the BPM. The AG's office will decide whether to file a formal accusation with the Medical Board seeking disciplinary action.

"Others, like Williams, who now lives in Palm Springs, took it a step further and sued Carver for malpractice. Carver has been sued for substandard care 13 times over the past 13 years, and several of those plaintiffs— either at the time or in recent conversations with The Chronicle—say they were influenced by the doctor's connections with athletes.

" 'Actually, that's why I went there,' said Sandra Skillman, of Pine Valley (San Diego County), who won a $30,000 arbitration award against Carver in 1997.

" 'I figured if he did OK with them and they trusted him, then I could do OK.'

"Carver said very few patients asked exactly what he did for the athletes, but when they did he told them he had fitted most of them for supports. Carver said there's nothing on his walls currently because he's sharing office space with some vascular surgeons, but he recently pulled out several photos from storage in which the signatures made references to orthotics.

" 'If a patient came in and saw the pictures on the wall and got excited,' Carver said, 'some people like the idea that they've sort of touched fame or

greatness indirectly through their doctor. . . . If they (assumed) that I did a lot of foot implants, they should have asked.'

"Williams said he didn't remember any signed pictures specifically mentioning insoles or orthotics.

"Doctors as Stars

"Forty years ago, there was little notion of sports medicine as its own discipline. Today not only are the yellow pages teeming with specialists, but the walls of some doctors' offices are covered with signed photos, jerseys and posters—sometimes to the point of resembling a sports bar.

"The industry that was born out of the fitness boom of the '70s has grown into something so linked to the culture of big-time sports that certain doctors have as much name recognition as athletes.

"Alabama orthopedist Dr. James Andrews regularly shows up in the sports pages, frequently identified as renowned, noted or famed. Some say Los Angeles orthopedist Dr. Frank Jobe revolutionized the industry in 1974 with a career-saving procedure he performed on pitcher Tommy John's elbow; it's now known simply as 'Tommy John surgery.' Colorado-based Dr. Richard Steadman started with a small practice in Lake Tahoe in the early '70s and, through working with skiers and, ultimately, the U.S. Ski Team, became one of the most highly sought knee surgeons in the country.

" 'I think it certainly helped to have high-profile patients, and it does, in fact, help build your practice,' said Steadman, who said he didn't believe most doctors working with athletes got into it for that reason.

"Andrew Carver said he got into it by chance in the early '80s, when a couple Oakland Raiders were referred to him. Shortly thereafter, he said he had a stint as the team podiatrist for the Oakland Invaders of the short-lived United States Football League.

"Carver's contact with athletes became more frequent in the late '80s, when he treated tennis player Brad Gilbert for an ankle injury. Carver initially told The Chronicle he performed surgery on Gilbert and mentioned no one else working with him; he amended that later to say he brought in three other doctors to assist him. But podiatrist Larry Oloff, now the Giants' and 49ers' foot specialist, said Carver asked him to join him and perform the procedure because, '(Carver) didn't do that kind of surgery at the time.'

"Carver and Gilbert became friends—which eventually led to Carver working for a time as the volunteer podiatrist for an annual pro tennis

tournament in the Bay Area. Gilbert said he ended his connections with Carver abruptly in 1994 when he grew tired of the doctor using their association to try to get business.

" 'He was always wanting things, needing things, going up the food chain, dropping my name all over the place,' Gilbert said.

"Carver said the friendship ended for personal reasons.

"Carver also established a relationship with Montana in the late '80s. In the first of several interviews with The Chronicle, Carver said, 'I took care of Bonds most recently, I've done Montana a lot.' Asked later the extent of his treatment of Montana, Carver said he fitted the Hall of Fame quarterback for orthotics and once took care of an in-grown nail.

"He said Montana and wide receiver Jerry Rice helped him in 1989 get into the 49ers' Santa Clara training facility, where he said he spent one day a week for a few weeks fitting players for orthotics.

"Carver also began an association with the Warriors in 1989. He did hold the title of team podiatrist, though there are conflicting stories on how long the relationship lasted, the scope of his treatment and the nature of his departure. Carver said he was with the team until 1996, when he resigned because he 'got so frustrated with the medical team at the time.' He said he was always the outsider but did treat several of the players, including once performing surgery on guard Mario Elie.

"Dr. Robert Albo, the Warriors team physician for the past 30 years and a fixture on the East Bay medical scene, said he thought Carver was with the team for a much shorter time than the podiatrist indicated. Albo said he recalled that Carver, who was not paid a salary, was told his services were no longer needed and that the issues were mainly personality-related—noting Carver's interest in exploiting his association with the Warriors.

" 'He would solicit other people by saying exactly what he said to you: I've worked for the Warriors,' Albo said.

"Last year, while serving as an expert witness in a case against an Arizona podiatrist, Carver was asked about his history with the Warriors. At the time, according to court transcripts, his Curriculum Vitae listed him still working with the team. He acknowledged that was incorrect but then added, 'I still do consulting to them. . . . I still get consulting calls from them. . . . I get consulting calls from these teams.'

"In fact, Carver hadn't received a call from the Warriors since, at the latest, 1996.

"Asked about his testimony, Carver said he was referring to calls he still receives from individual players, some retired, some active. He declined to name anyone specifically.

"In the 2002 edition of The Legal Expert Pages, a paid directory that serves as a referral service for attorneys seeking expert witnesses, Carver lists himself as having been the 49ers' team podiatrist.

"Carver said The Legal Expert Pages made a mistake. The company said the advertisement reflected the information the podiatrist provided.

"Information Hard To Get

"There's not a lot of information readily available to the public concerning a doctor's litigation history and/or interactions with the Medical Board. For instance, the Board is obligated to disclose all medical malpractice judgments and arbitration awards reported in the past five years, but only those exceeding $30,000 for the five years prior to that. And settlements of any sum are not public.

"There's no clearinghouse for listings of lawsuits, nothing to streamline the information-gathering process. And complaints to the Medical Board become public, for the most part, only if referred for legal action.

"So in the case of Carver, a check of the Medical Board Verification System by phone or through its Web site would reveal he has one malpractice judgment against him, for $100,000 in 1994.

"What you wouldn't learn is that he has had 22 complaints filed against him dating back to 1990, according to documents obtained by The Chronicle, and that his career has been marked by a spate of lawsuits from 1990 to 2000.

" 'We have about 2,000 licensed (podiatrists) in California, and I would say that most of them, or the majority of them, have never had a complaint filed against them,' said Rathlesberger, the executive officer of the state podiatric board. 'And then I would say the majority of them have probably never had a malpractice suit filed against them.'

"During interviews, Carver attributed the number of cases brought against him to his performing a lot of experimental surgery and to a San Francisco doctor who was out to get him.

" 'I am a very high-profile doctor who sort of stands alone,' said Carver, who began practicing in the Bay Area in the late '70s. 'There was a foot orthopedist that sort of came to town 10 years after me that found out that I was very busy and I was very successful, and there were, in my opinion, things were sort of created, cases where there were what we call "complication cases" that ended up as malpractice suits and that 90 percent of them were dropped or disappeared.'

"Carver declined to name the doctor he said was behind many of the suits brought against him.

"Carver's legal entanglements also have led to difficulties maintaining his malpractice coverage and his surgical privileges—issues that were detailed about a year ago when he was cross-examined in the Arizona case.

"While Carver was on the stand, transcripts show that defense attorney George Mitchell presented evidence that several times between 1993 and 2000 Carver provided false or misleading information while applying to hospitals to obtain or renew surgical privileges; that his malpractice coverage was dropped by the Podiatric Insurance Company of America (PICA) at one point in 1996; and that he once used white-out to alter a document from PICA that said he was not covered for surgical procedures.

"Carver blamed his staff repeatedly during his testimony, saying that employees had filled out and/or altered the documents. He said he fired two employees through the years who had provided false information.

"The transcripts from that case, as well as other materials, ultimately landed in the hands of the Medical Board and are being examined as part of the ongoing investigation into Carver, according to the state source familiar with the inquiry.

"Out Of Step With Bonds

"A few months ago, Carver got himself an audience with the Sacramento Kings. He had been introduced to one of the team's owners, Joe Maloof, by a friend who was Maloof's tennis instructor.

"The first time The Chronicle contacted Carver, in late September, he said he was being 'wooed by' the Kings.

" 'It may or not happen because of the political group already in place,' Carver said. 'If you're a sports doctor for any pro sports team, there's a big, big marketing benefit.'

"Not long after, the Kings told Carver they weren't interested. Geoff Petrie, the Kings' president of basketball operations, said the meeting was mainly held as a courtesy to Maloof and the team was happy with its medical staff. Still, Petrie said the team did its 'due diligence' to check comments made by Carver during the interview, with trainer Pete Youngman making several calls.

"The Kings don't allow Youngman to speak to the media, but team doctor Richard Marder said, '(Carver) talked about different athletes that he had worked with, and the trainer called different teams and different individuals to substantiate those claims and found that in a large number of cases they just weren't true.'

"Bonds, who apparently did have a short-lived business relationship involving electric cars with Carver, was among the names the doctor mentioned. Petrie said Carver inferred he played a pivotal role in the Giant's record-breaking season by providing him with orthotics.

"Asked how that was inferred, Petrie said, 'I guess inferred is probably the wrong word. He pretty much said that.'

"Said Carver: 'I can certainly tease about that. I can say that happens to be the year he hit 73 home runs, but come on, obviously I know that I didn't hit any balls over the fence. But you know, he didn't have any foot injuries that year.'

"Carver said he cast Bonds for orthotics toward the end of the 2000 season and that Harvey Shields, Bonds' personal trainer, told him the superstar was wearing his supports during the following season.

" 'Barry said, "No he didn't," ' said Giants assistant trainer Barney Nugent, who spoke with Bonds after the Kings' trainer called to check on Carver's assertions. 'He said he made him up a pair of orthotics the year before and didn't use them. . . . Barry told me some things, but I'd rather not say what he said and you probably couldn't print some of it.'

"Asked by The Chronicle about Carver, Bonds said only, 'I don't like that man. I don't like that man. He's a liar.'

Under the heading "Consumer Tips," the article concluded with a series of "suggestions and resources to help you find and learn about your doctor."

The article appeared in the Chronicle newspaper and on the Chronicle's Web site. In December 2003, plaintiff demanded a retraction from the

Chronicle of allegedly false and defamatory statements in the article, and then filed this lawsuit. The motions of the Newspaper, Bonds, and Craig to strike under the anti-SLAPP statute were granted in July 2004, and this appeal ensued.

## II. DISCUSSION

### A. *Issues and Scope of Review*

Ruling on an anti-SLAPP motion is "a two-step process. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. . . . If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, .67 [124 Cal.Rptr.2d 507, 52 P.3d 685].) Anti-SLAPP motion rulings are reviewed on appeal de novo. (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 894 [17 Cal.Rptr.3d 497].)

### B. *Protected Activity*

The anti-SLAPP law protects "any act . . . in furtherance of the [defendant's] right of petition or free speech under the United States or California Constitution in connection with a public issue . . . ." (§ 425.16, subd. (b).) Such acts include: "(2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(2)–(4) (hereafter subdivisions (e)(2), (e)(3), and (e)(4), respectively).) The statute is to be broadly construed. (§ 425.16, subd. (a).)

The trial court found that the statements at issue were covered by subdivisions (e)(2), (e)(3), and (e)(4). We conclude that the statements fall within subdivision (e)(4), and thus need not decide whether subdivision (e)(2) or (e)(3) is applicable.

Stating facts and opinions about plaintiff was plainly "conduct in furtherance of the exercise of . . . [defendants'] constitutional right[s] of free speech" within the meaning of subdivision (e)(4). Plaintiff's argument to the contrary is that "conduct" under this subdivision refers only to actions such

as picketing or demonstrations, and not to written or oral statements. He reasons that, if a contrary conclusion were drawn, subdivision (e)(3) would be entirely subsumed in subdivision (e)(4) and thereby rendered meaningless. However, neither this court nor others have given subdivision (e)(4) the narrow interpretation plaintiff urges. We recently concluded that a statement as to why an employee was terminated was protected under subdivision (e)(4). (*Fontani v. Wells Fargo Investments* (2005) 129 Cal.App.4th 719, 732 [28 Cal.Rptr.3d 833].) Other courts have likewise applied subdivision (e)(4) to statements. (*Vogel v. Felice* (2005) 127 Cal.App.4th 1006, 1015 [26 Cal.Rptr.3d 350] [venturing that challenges to "pure speech" would *always* involve "conduct" within the meaning of subdivision (e)(4)]; see also, e.g., *Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1545–1546 [33 Cal.Rptr.3d 145]; *Wilbanks v. Wolk, supra,* 121 Cal.App.4th at pp. 897–898.) Plaintiff might have a stronger argument if subdivisions (e)(3) and (e)(4) were enacted at the same time, but subdivision (e)(4) was added later in order to broaden the statute. (Stats. 1997, ch. 271, § 1; see *Terry v. Davis Community Church, supra,* 131 Cal.App.4th at pp. 1545–1546; *Wilbanks v. Wolk, supra,* 121 Cal.App.4th at p. 897, fn. 4.) Accordingly, we are not persuaded that the "conduct" covered by subdivision (e)(4) is as limited as plaintiff claims.

The article also involved "a public issue or an issue of public interest" under subdivision (e)(4). Such an issue was found to be present in an analogous situation in *Wilbanks v. Wolk, supra,* 121 Cal.App.4th at pages 898–899, where the statements in question were directed against a broker of viatical settlements (arrangements that allow dying persons with life insurance policies to sell their policies to investors for a percentage of the death benefits). The brokerage and its owner sued the defendant for defamation after the defendant reported on her Web site that the broker was being investigated by the California Department of Insurance, warned readers to "[b]e very careful when dealing with this broker," said that the broker had "provided incompetent advice," and called the broker "unethical." (*Id.* at p. 890, italics omitted.) The statements did not relate to a public issue under commonly articulated criteria because "plaintiffs are not in the public eye, their business practices do not affect a large number of people and their business practices are not, in and of themselves, a topic of widespread public interest." (*Id.* at p. 898.) The statements were nevertheless of public concern because they were "consumer protection information . . . . The statements made by [the defendant] were not simply a report of one broker's business practices, of interest only to that broker and to those who had been affected by those practices. [The defendant's] statements were a warning not to use plaintiffs' services. In the context of information ostensibly provided to aid consumers choosing among brokers, the statements, therefore, were directly connected to an issue of public concern." (*Id.* at p. 900.) The same reasoning

applies equally here. The article warned readers not to rely on doctors' ostensible experience treating professional athletes, and told what it described as "a cautionary tale" of plaintiff exaggerating that experience to market his practice. Since the statements at issue served as a warning against plaintiff's method of self-promotion, and were provided along with other information to assist patients in choosing doctors, the statements involved a matter of public concern. (*Ibid.*)

The challenged statements were therefore protected activity under the anti-SLAPP law.

## C. *Probability of Prevailing*

### (1) *Legal Standards*

■ In order to establish a probability of success, the plaintiff must make " 'a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence [he submits] is credited.' " (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733].) Although the court does not weigh the probative strength of competing evidence (*ibid.*), the motion to strike should be granted if the defendant "defeats the plaintiff's showing as a matter of law, such as by establishing a defense or the absence of a necessary element." (*1-800 Contacts, Inc. v. Steinberg* (2003) 107 Cal.App.4th 568, 585 [132 Cal.Rptr.2d 789].)

■ To defeat the motions to strike in this case plaintiff had to make a prima facie showing that the challenged statements were both false and defamatory. (See *Vogel v. Felice, supra,* 127 Cal.App.4th 1006, 1019, 1021.) A statement is not defamatory unless it can reasonably be viewed as declaring or implying a provably false factual assertion (*Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 385 [10 Cal.Rptr.3d 429]), and it is apparent from the "context and tenor" of the statement "that the [speaker] seriously is maintaining an assertion of actual fact." (*Weller v. American Broadcasting Companies, Inc.* (1991) 232 Cal.App.3d 991, 1000–1001 [283 Cal.Rptr. 644].) As we have said, the statements in question here were in the nature of consumer protection information, and as such involved a matter of public concern under the First Amendment. (*Nizam-Aldine v. City of Oakland* (1996) 47 Cal.App.4th 364, 377 [54 Cal.Rptr.2d 781].) Plaintiff therefore bears the burden of proving that the statements are false, even if he is not considered a public figure for purposes of this suit. (*Id.* at pp. 373–375; *Stolz v. KSFM 102 FM* (1994) 30 Cal.App.4th 195, 202 [35 Cal.Rptr.2d 740].) "California law permits the defense of substantial truth," and thus a defendant is not liable " 'if the substance of the charge be proved true . . . .' " "Put another way, the statement is not considered false unless it 'would have

a different effect on the mind of the reader from that which the . . . truth would have produced.' " (*Masson v. New Yorker Magazine* (1991) 501 U.S. 496, 516–517 [115 L.Ed.2d 447, 111 S.Ct. 2419].)

### (2) *Claims Involving Bonds and Craig*

Plaintiff contends that Bonds's statements about him in the article—"I don't like that man. I don't like that man. He's a liar."—constituted actionable slander. In connection with those remarks, the article reported that: Bonds and plaintiff had a brief business relationship; plaintiff said that he had cast Bonds for orthotics and suggested to people that he had helped Bonds achieve his home run record; plaintiff said he was told by Bonds's personal trainer that Bonds wore plaintiff's orthotics during the record-breaking season; and Bonds told a Giants's assistant trainer he had not worn plaintiff's supports, along with some other things about plaintiff that were probably unprintable.

In his declaration in support of his motion to strike, Bonds said that plaintiff approached him in 2001 about endorsing a line of electric bikes and scooters, but no deal was struck. Bonds said that when he refused to pay plaintiff for scooters and bikes that plaintiff had lent him and that he had returned to plaintiff, the latter "threatened to call the press and say that I came to a party of his high on marijuana, which was a lie." Despite this threat, Bonds said he never paid plaintiff for use of the bikes and scooters. On a different subject, Bonds said that plaintiff offered in the spring of 2001 to make him a trial set of orthotics, and if he liked them, to supply him with additional orthotics for free. Bonds said that, based on the test set, he ordered and received more orthotics from plaintiff around the end of the 2001 season, but never used them. Bonds said he was surprised to receive a $1,575 billing from plaintiff for the orthotics, and asked his accountants to tell plaintiff that he did not owe him any money. Bonds said that he eventually decided, after prolonged haggling between his accountants and plaintiff, to pay the bill to get plaintiff "off [his] back" and save the cost of having his accountants deal with the matter.

Bonds further declared that he made the statements at issue in the case when he was approached by defendant Fainaru-Wada and another man on his way out to the field before a 2002 baseball game. He said that he meant only to convey a subjective opinion when he called plaintiff a liar, but that he believed in any event that plaintiff was in fact a liar. Bonds thought that plaintiff had been "less than truthful in his dealings with me," because "he gave me the impression that he was giving me free orthotics and then billed me for them," and "he threatened to lie to the press about me."

In response to Bonds's motion, plaintiff stated that he supplied Bonds with 12 pairs of orthotics, and produced a copy of the $1,575 check he received for them. Plaintiff's declaration states with respect to Bonds only that "[i]n the past, I did provide medical treatment or consultation to defendant [Bonds]. I took a complete podiatric history, provided a complete podiatric biomechanical exam, and complete standard treatment of casting for neutral orthotics."

■ Calling someone a liar can convey a factual imputation of specific dishonest conduct capable of being proved false (see generally *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 18–20 [111 L.Ed.2d 1, 110 S.Ct. 2695] (*Milkovich*)), and may be actionable depending on the tenor and context of the statement (*Weller v. American Broadcasting Cos., Inc., supra,* 232 Cal.App.3d at pp. 1000–1001). In *Milkovich*, for example, the plaintiff could maintain a defamation action for a newspaper opinion column branding him as a liar because the article implied that he had committed perjury in a particular case, and the alleged falsity of the charge could be determined "on a core of objective evidence." (*Id.* at p. 21.) However, " 'rhetorical hyperbole,' 'vigorous epithet[s],' 'lusty and imaginative expression[s] of . . . contempt,' and language used 'in a loose, figurative sense' have all been accorded constitutional protection." (*Ferlauto v. Hamsher* (1999) 74 Cal.App.4th 1394, 1401 [88 Cal.Rptr.2d 843].) Thus, calling someone a liar was not actionable in *Rosenaur v. Scherer* (2001) 88 Cal.App.4th 260, 280 [105 Cal.Rptr.2d 674], where the statement was made in a heated oral exchange during a chance encounter of opponents in a political campaign. In those circumstances, the charge was one that "no reasonable person would [have] take[n] literally," and was "the type of loose, figurative, or hyperbolic language that is constitutionally protected." (*Ibid.*) Similarly, in *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1440, an attorney could not be disciplined for calling a judge "dishonest" because the word was only "one in a string of colorful adjectives" used in a letter that "together . . . convey[ed] nothing more substantive than [the attorney's] contempt." In context, the word could not "reasonably be construed as suggesting that [the judge] had committed specific illegal acts," and was thus mere "rhetorical hyperbole, incapable of being proved true or false." (*Ibid.*)

Both sides have room for argument under these precedents. An average reader of the article could have understood the lie or lies to which Bonds alluded to be plaintiff's claim that Bonds had worn plaintiff's orthotics during his record-breaking season. (See generally *Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260 [228 Cal.Rptr. 206, 721 P.2d 87] [whether statement is an actionable one of fact or a protected one of opinion is determined by its " 'natural and probable effect upon the mind of the average reader' "].) In that event, there was a potentially innocent explanation for what Bonds took to be a lie: the information plaintiff said he received

from Bonds's personal trainer. However, the "liar" epithet might also have been taken to refer to something dishonorable that transpired in the business or professional dealings mentioned in the article, and where a statement is "susceptible of both an innocent and libelous meaning, it is for [a] jury to decide how [it was] in fact understood." (*Weller v. American Broadcasting Cos., Inc., supra,* 232 Cal.App.3d at p. 1001, fn. 8.) On the other hand, in the context of an outspoken athlete's flippant remarks before a game about someone he dislikes, the word "liar" would seem to be merely an expression of contempt (*Standing Committee v. Yagman, supra,* 55 F.3d at p. 1440), and the sort of " 'broad, unfocused and wholly subjective comment' " that is generally regarded as protected opinion (*Copp v. Paxton* (1996) 45 Cal.App.4th 829, 837 [52 Cal.Rptr.2d 831]).

■ But even if the statement were potentially defamatory under the circumstances, plaintiff must nevertheless make a prima facie showing that it was substantially false (*Masson v. New Yorker Magazine, supra,* 501 U.S. at pp. 516–517; *Wilson v. Parker, Covert & Chidester, supra,* 28 Cal.4th at p. 821; *Vogel v. Felice, supra,* 127 Cal.App.4th at p. 1021), and he has failed to carry that burden. Bonds has declared, and plaintiff has not denied, that plaintiff threatened to lie to the press about him, and reneged on an offer to supply him with free orthotics. Bonds was justified in calling plaintiff a liar in view of those undisputed facts. As *Underwager v. Channel 9 Australia* (9th Cir. 1995) 69 F.3d 361, 367, noted, "the term 'lying' applies to a spectrum of untruths, including 'white lies,' 'partial truths,' 'misinterpretation,' and 'deception.' " We likewise think the term "liar" is broad enough to encompass someone who commits or threatens the dishonest acts Bonds described. Since it appears from the evidence that there was substantial truth to Bonds's charge that plaintiff lied in his dealings with him, plaintiff has not established a probability of prevailing on his defamation claim against Bonds.

At issue with respect to Craig are the statements that he never had problems with his feet or ankles, that he did not remember plaintiff, and that he would have remembered plaintiff if he had had a relationship with him. Craig declared in support of his motion to strike that he was accurately quoted in the article, that he did not know who plaintiff was, and that he would not have worn plaintiff's orthotics because he does not like foot supports and his chiropractor told him not to wear them. In response, plaintiff declared that Craig was referred to him in 1989 by Craig's friend and teammate Jamie Williams, and that he gave Craig "a physical exam and biomechanical exam and casted [him] for neutral orthotics. [Craig] never made mention of any chiropractic recommendation, and he was very happy to get the orthotics when I personally delivered them to him at the 49ers Training Facility." Plaintiff also produced a copy of a photo of Craig signed, "To Andrew, Thanks for taking care of my feet!" In his declaration, Craig

said he did not know whether he had signed a picture for plaintiff, "but if I did it's because when I was with the 49ers I autographed pictures all the time."

Plaintiff cannot prevail on the merits against Craig because the statements in question did not convey provably false assertions of fact. (*Vogel v. Felice, supra,* 127 Cal.App.4th at p. 1019.) Insofar as it appears from plaintiff's declaration, he may have seen Craig only twice, both times more than a decade before Craig was asked about him. Thus, it was understandable that Craig would not remember having a "relationship" with him. But whether Craig remembered plaintiff, and would have remembered him if they had had a relationship, turned in any event on the strength of Craig's memory of distant and isolated events, and on what he considered a "relationship"— entirely subjective matters rather than provably false factual assertions.

■ A republisher is deemed to have adopted statements that are defamatory. (*Khawar v. Globe Internat., Inc.* (1998) 19 Cal.4th 254, 268 [79 Cal.Rptr.2d 178, 965 P.2d 696].) However, since plaintiff has no probability of prevailing against Bonds or Craig, the Newspaper cannot be held liable for republishing their statements.

 (3) *Claims Solely Against the Newspaper*

 (a) *Plaintiff's Allegations*

Plaintiff maintains that the gist of the article—that he exaggerated his ties with professional sports teams and athletes to market his practice—was false and defamatory. Plaintiff also contests the article insofar as it stated or implied that he: (1) was the subject of 22 complaints to the state Medical Board; (2) said he worked alone when he operated on Brad Gilbert; (3) did no work for athletes other than fitting them with foot supports; (4) had essentially no connection to 49er players after 1989; (5) misrepresented himself as the 49er team podiatrist; (6) placed signed photos of famous athletes on his office walls to mislead patients; and (7) boasted of a 100 percent success rate.

 (b) *Whether the Challenged Statements Were Privileged*

■ The Newspaper's threshold argument is that the article was an accurate report of the Board of Podiatric Medicine's (BPM) investigation of plaintiff, and thus privileged under Civil Code section 47, subdivision (d) as "a fair and true report in . . . a public journal, of . . . a . . . public official proceeding . . . ." The Newspaper bears the burden of proving that the

privilege applies. (*Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 109 [15 Cal.Rptr.3d 215].)

The article stated that the BPM was an affiliate of the state Medical Board, that plaintiff was being investigated by the Medical Board, and that the Medical Board was "looking into a quality-of-care case and allegations he falsified malpractice insurance documents and lied about his record of lawsuits." The article reported that patient Thoresen had filed a complaint against plaintiff with the BPM, and that, according to BPM official Jim Rathlesberger, the complaint was referred to the Attorney General's office. The article indicated that in its ongoing investigation the Medical Board was examining transcripts from the Arizona case in which plaintiff testified, and other materials as well.

According to the evidence presented on the Newspaper's motion, the Attorney General filed an accusation against plaintiff with the BPM in December 2003 seeking to revoke or suspend his podiatric license on four grounds: (1) his conviction of spousal battery committed in December 2001 (Pen. Code, § 243, subd. (e)(1)); (2) his wife's July 2001 report to police of violent conduct on his part, including threats to have her killed; (3) dishonesty as revealed in the Arizona testimony; and (4) deceptive advertising, based on the photos of prominent athletes in his office and quotations from the Chronicle article. In April 2004, plaintiff admitted the criminal conviction alleged in the accusation and surrendered his license to the BPM, with the understanding that the other charges in the accusation could be considered if he ever applied to have the license reinstated.

Rathlesberger declared in support of the Newspaper's motion to strike that when the article at issue was published the Attorney General was in fact investigating plaintiff "for various things, and my statements to the Chronicle were simply reports to that newspaper of a contemplated official proceeding against Dr. Carver. [¶] . . . [¶] Our office became aware during the course of our investigation of Dr. Carver referred to above that Dr. Carver allowed patients to assume that he had surgically treated prominent professional athletes. That issue eventually became the basis of the Fourth Cause for Discipline in [the accusation] . . . . [¶] . . . [¶] I have read [the article at issue] and I believe that it was a fair and true report of our investigation of Dr. Carver and the formal Accusation which resulted therefrom." Plaintiff filed a lawsuit against Rathlesberger in 2001 alleging various tort causes of action arising out of Rathlesberger's handling of a complaint to the BPM against plaintiff. Rathlesberger's demurrer to the complaint was sustained without leave to amend. Plaintiff asserted in his declaration in opposition to the Newspaper's motion that Rathlesberger had "been conducting a personal vendetta against me" since plaintiff had sued him.

The Newspaper notes that governmental investigations of malfeasance are considered official proceedings for purposes of the Civil Code section 47, subdivision (d) privilege even if they yield no formal charges. (*Braun v. Chronicle Publishing Co.* (1997) 52 Cal.App.4th 1036, 1050, fn. 6 [61 Cal.Rptr.2d 58].) However, all of the challenged statements other than the number of complaints to the Medical Board concern various forms of alleged false advertising on plaintiff's part, and it is not apparent that the advertising aspect of plaintiff's conduct was being investigated before the Newspaper reported on it. Rathlesberger's declaration does not say that the BPM was concerned about plaintiff's deceptive advertising when the article was published; he simply avers that plaintiff was being investigated for "various things" at the time; and that the BPM became aware of the advertising issue "during the course of our investigation," which continued after the article appeared. The Newspaper's claim that false advertising was being investigated when the article was published is belied by the article itself, which specifically describes what was being investigated—a malpractice charge based on Thoresen's complaint, and falsification of insurance documents and lying about the record of lawsuits based on plaintiff's Arizona testimony— without any indication that the investigation encompassed any of the false advertising on which the article reported. Given the article's description of the investigation, Rathlesberger's averment that the article was a fair and true report of the investigation does not assist the Newspaper's privilege argument. The Newspaper observes that a false advertising count was included in the accusation eventually filed against plaintiff. However, that count referred to statements in the article, and insofar as it appears from the record the article may have prompted the investigation that led to that charge. Accordingly, as to most of the challenged statements, the Newspaper has not met its burden of showing that the privilege applies.

■ The only part of the article possibly shown to have been privileged was its report on the number of complaints that had been filed against plaintiff with the Medical Board. Civil Code section 47, subdivision (b) protects statements made in an "official proceeding authorized by law," including communications "intended to instigate official governmental investigation into wrongdoing." (*Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, 370 [7 Cal.Rptr.3d 803, 81 P.3d 244]; see also *Fontani v. Wells Fargo Investments, supra*, 129 Cal.App.4th at pp. 734–735.) Complaints to regulatory agencies such as the BPM are likewise considered to be part of an "official proceeding" under the anti-SLAPP statute. (§ 425.16, subd. (e)(1); *Fontani v. Wells Fargo Investments, supra*, 129 Cal.App.4th at p. 730.) It follows that a report of such complaints is a report of an "official proceeding" for purposes of Civil Code section 47, subdivision (d).

■ Civil Code section 47, subdivision (d), unlike Civil Code section 47, subdivision (b) and section 425.16, subdivision (e)(1), refers to "public"

official proceedings, but the word "public" in this context simply means governmental, as opposed to private. (*Crane v. The Arizona Republic* (9th Cir. 1992) 972 F.2d 1511, 1518.) Thus, the fact that the complaints were, as the article reported, confidential and not open to the public (see Bus. & Prof. Code, §§ 800, 803.1) does not prevent a report of them from being privileged under Civil Code section 47, subdivision (d). (*Braun v. Chronicle Publishing Co., supra,* 52 Cal.App.4th at pp. 1050–1052.) ██ The Chronicle and its Web site are "public journal[s]" within the meaning of this statute. (See *Colt v. Freedom Communications, Inc.* (2003) 109 Cal.App.4th 1551, 1555, 1558 [1 Cal.Rptr.3d 245].) The only question, then, is whether the article's report of the complaints was "fair and true."

The article said that 22 complaints were filed against plaintiff with the Medical Board dating back to 1990. Defendant Fainaru-Wada declared in support of the motion to strike that he obtained records showing that 22 complaints had in fact been filed. In opposition to the Newspaper's motion, plaintiff filed letters from the Medical Board suggesting that he had been the subject of fewer complaints than the article reported: in February 2003, plaintiff was advised that six complaints had been made against him; in January 2004, the Medical Board reiterated that it had only six complaints on file, and stated that "[a]nyone purporting to have additional information does not have correct information." However, the 2004 letter also indicated that a case file from 1994 had been "removed and destroyed from our records several years ago" pursuant to the Medical Board's file retention policy. Since the article cited complaints from 1990, and it appears from the correspondence that the Medical Board may not have retained records dating back to that year when it advised as to the number of complaints "on file," it is unclear from the evidence whether six or 22 complaints were lodged during the period the article covered.

██ The article could, in any event, qualify as a fair and true report of the complaints against plaintiff even if it overstated their number. " '[E]rroneous statement is inevitable in free debate, and . . . must be protected if the freedoms of expression are to have the "breathing space" that they "need . . . to survive." ' " (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 261 [208 Cal.Rptr. 137, 690 P.2d 610].) Thus, the "fair and true" requirement "does not limit the privilege to statements that contain no errors." (*Colt v. Freedom Communications, Inc., supra,* 109 Cal.App.4th at p. 1558.) "Under California law, a newspaper report is 'fair and true' if it captures ' "the substance, the gist, the sting of the libelous charge" ' [Citations.] The news article need not track verbatim the underlying proceeding. Only if the deviation is of such a 'substantial character' that it 'produce[s] a different effect' on the reader will the privilege be suspended. [Citation.] News articles, in other words, need only convey the substance of the

proceedings on which they report, as measured by their impact on the average reader." (*Crane v. The Arizona Republic, supra,* 972 F.2d at p. 1519.)

The 22 Medical Board complaints allegedly filed against plaintiff were initially linked in the article with the "inordinate string" of malpractice complaints against him, a total of 13 lawsuits in 13 years according to the article. Plaintiff does not deny being sued that many times, and, indeed, the evidence on the Newspaper's motion showed that the article actually under-stated the number of his malpractice cases. The article later referred again jointly to the alleged 22 Medical Board complaints and the "spate of [malpractice] lawsuits" against plaintiff, and then quoted Rathlesberger as saying that most of the state's 2,000 podiatrists had never been the subject of any such complaint or suit. The "sting" of the references to complaints, whether administrative or judicial, was thus that plaintiff had received an unusually large number of them. That essential point would have been the same whether the number of Medical Board complaints had been six or 22; the lower figure would not, in context, have had a different effect on the reader than the higher one. The article's references to the Medical Board complaints were therefore privileged even if their number was exaggerated as plaintiff claims. (Civ. Code, § 47, subd. (d); *Crane v. The Arizona Republic, supra,* 972 F.2d at p. 1519; *Colt v. Freedom Communications, Inc., supra,* 109 Cal.App.4th at p. 1558.)

### (c) *Whether Plaintiff was a Public Figure*

The Newspaper's next argument is that plaintiff was a limited purpose public figure with respect to the subjects covered in the article, and must therefore establish by clear and convincing evidence that the challenged statements were made with actual malice, i.e., with knowledge of their falsity or reckless disregard for their truth. (See generally *Reader's Digest Assn. v. Superior Court, supra,* 37 Cal.3d at pp. 252–254; *Ampex Corp. v. Cargle* (2005) 128 Cal.App.4th 1569, 1577 [27 Cal.Rptr.3d 863].) The Newspaper submits that the requisite showing of malice cannot be made in view of the declarations it has submitted from sources of information for the article attesting to its accuracy.

Limited purpose public figures are those who "invite attention and comment" by "thrust[ing] themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." (*Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 345 [41 L.Ed.2d 789, 94 S.Ct. 2997].) For a person to be characterized as a limited purpose public figure, there must "[f]irst . . . be a public controversy, which means the issue was debated publicly and had foreseeable and substantial ramifications for nonparticipants. Second, the plaintiff must have undertaken some voluntary

act through which he or she sought to influence resolution of the public issue. In this regard it is sufficient that the plaintiff attempts to thrust him or herself into the public eye. And finally, the alleged defamation must be germane to the plaintiff's participation in the controversy." (*Ampex Corp. v. Cargle, supra,* 128 Cal.App.4th at p. 1577.)

Plaintiff argues that he never injected himself into an existing public controversy, and that there was no public controversy regarding his means of self-promotion until the Chronicle created one by publishing the article. The Newspaper observes that plaintiff dubbed himself "a very high-profile doctor who sort of stands alone," and submits that "[a] man cannot engage in ceaseless self-promotion as the 'go-to guy' in his field without inviting some attention as to his experience and credentials and whether prospective clients or customers really should 'go to' him."

██ As previously noted, all of the nonprivileged statements at issue concerned false advertising—allegations that plaintiff exaggerated his accomplishments, especially the extent to which he had treated professional athletes, to attract patients. Whether an advertiser is a public figure for purposes of a false advertising claim was addressed in *Vegod Corp. v. American Broadcasting Companies, Inc.* (1979) 25 Cal.3d 763 [160 Cal.Rptr. 97, 603 P.2d 14] (*Vegod*). The plaintiffs there had been hired to conduct the going-out-of-business sale of the City of Paris, a respected department store. The defendants reported in a TV news broadcast that the plaintiffs had " 'been brought in to handle the closeout, a closeout the Better Business Bureau says has deceived the public that trusts the name City of Paris and promises bargains that are not really bargains at all.' " (*Id.* at p. 766.) The court rejected the defendants' argument that the plaintiffs became public figures by selling goods to the public and by advertising the sale: "While availability of goods for sale and their quality are matters of public interest, this is not the test. The public interest test was expressly rejected in *Gertz* [*v. Robert Welch, Inc., supra,*] (418 U.S. at p. 346 [41 L.Ed.2d at p. 809]) and in [*Time, Inc. v.*] *Firestone* [1976] (424 U.S. [448] at pp. 455–456 [47 L.Ed.2d 154, 96 S.Ct. 958]), in favor of the public controversy test. (See also *Hutchinson v. Proxmire* (1979) 443 U.S. 111 [61 L.Ed.2d 411, 99 S.Ct. 2675].) [¶] Criticism of commercial conduct does not deserve the special protection of the actual malice test. Balancing one individual's limited First Amendment interest against another's reputation interest (*Herbert v. Lando* (1979) 441 U.S. 153, 169 [60 L.Ed.2d 115, 99 S.Ct. 1635]), we conclude that a person in the business world advertising his wares does not necessarily become part of an existing public controversy. It follows those assuming the role of business practice critic do not acquire the First Amendment privilege to denigrate such entrepreneur." (*Vegod Corp. v. American Broadcasting Companies, Inc., supra,* 25 Cal.3d at pp. 769–770.)

The *Vegod* case is squarely on point, and it precludes plaintiff from being found to be a public figure for purposes of statements accusing him of false advertising. If the holding of *Vegod* were simply that advertising does not necessarily make one a limited purpose public figure, then the case would not necessarily be controlling here. But *Vegod* rejected precisely the same public figure argument being advanced in this case by "business practice critic[s]" who are "denigrat[ing]" plaintiff for the content of his advertising. (*Vegod Corp. v. American Broadcasting Companies, Inc., supra,* 25 Cal.3d at p. 770.) Nothing in *Vegod* suggests that the result would be different where the plaintiff is selling professional services rather than commercial goods; in either case, the false advertising would be a matter of public interest, but not one of public controversy. Moreover, *Vegod*'s observation that the plaintiff must "become part of an *existing* public controversy" to be considered a limited purpose public figure (*ibid.,* italics added) confirms that the Newspaper could not create a public controversy simply by publishing an article that put plaintiff's behavior in the spotlight (*Hutchinson v. Proxmire, supra,* 443 U.S. at p. 135 [alleged defamer cannot create its own defense by making the claimant a public figure]).

The cases on which the Newspaper relies are distinguishable because none of them involved false advertising, and all of them involved an existing public controversy. (*Ampex Corp. v. Cargle, supra,* 128 Cal.App.4th at p. 1578 [responsibility for failure of publicly-traded company's multimillion dollar business venture]; *Copp v. Paxton, supra,* 45 Cal.App.4th at pp. 834–835, 846 [best means of avoiding earthquake injuries in public schools]; *Nadel v. Regents of University of California* (1994) 28 Cal.App.4th 1251, 1255, 1269 [34 Cal.Rptr.2d 188] [best use of public park]; *Rudnick v. McMillan* (1994) 25 Cal.App.4th 1183, 1187, 1190 [31 Cal.Rptr.2d 193] [responsibility for mismanagement of public land]; *Denney v. Lawrence* (1994) 22 Cal.App.4th 927, 931, 935–936 [27 Cal.Rptr.2d 556] [culpability for widely-publicized homicide].) Accordingly, plaintiff was not a public figure for purposes of the challenged statements.

### (d) *Whether Plaintiff Has Established a Prima Facie Case*

The Newspaper further argues that plaintiff has not demonstrated a probability of prevailing because the challenged statements were protected matters of opinion rather than actionable assertions of fact, or because plaintiff has not shown that the statements were false.

### (1) *Gilbert's Surgery*

The Newspaper cannot, of course, be held liable for a statement it did not make or repeat. One of the allegedly false statements was that plaintiff

operated alone on Brad Gilbert, but the article did not say that. The article said that when plaintiff discussed the surgery with the Chronicle, he initially did not mention any assistance, but later admitted having been assisted by other doctors. This disposes of the claim relative to Gilbert's surgery.

### (2) *Work Confined to Orthotics*

Plaintiff alleges that the article falsely stated that the only work he performed for athletes was to fit them with foot supports, but again, that is not what the article said. The article said that, although surgical procedures were reportedly a significant part of plaintiff's practice, *"virtually"* all of the work he did for athletes was fitting them for orthotics. (Italics added.) The article noted that plaintiff had performed surgery on Mario Elle as well as Gilbert, and that plaintiff had treated Joe Montana for an ingrown toenail as well as fitted him for orthotics. The article said that plaintiff admitted telling patients, when asked what he did for athletes, that he fitted "most" of them for supports. The article thus indicated that nearly all, not entirely all, of his work with athletes involved orthotics.

In his declaration in opposition to the Newspaper's motion, plaintiff did not represent that surgery was a significant part of his work with athletes, only that he had "done several surgeries on various professional athlete[s]." He said that during his time as team podiatrist for the Golden State Warriors he treated "quite a few players for custom biomechanical orthotic devices and for multiple other foot problems," including "injections for various tendinitis and neuromas to mechanical debridement of painful keratotic tissue to mechanical debridement of infected tissues, infected nails, etc." He said that he performed "a full podiatric medical exam" when he cast a player for orthotics, and he produced records of payments for orthotics from Bonds, Craig, Montana, Jerry Rice, Ronnie Lott, Chris Mullin, Mitch Richmond, Latrell Sprewell, and other athletes.

Plaintiff's evidence does not show that the article was materially false in reporting that virtually all of his work with athletes involved orthotics. He does not deny telling patients, as reported in the article, that he fitted "most" of the athletes he treated for foot supports. He states in his declaration that he also operated on athletes and treated them for things like toenail problems, but that work was mentioned in the article. The only records he produced for treatment of athletes were of payments for orthotics.

It thus appears that the article was substantially true in indicating that virtually all of his work with athletes was confined to orthotics.

### (3) Ongoing Relationships With 49er Players

Plaintiff's evidence also failed to controvert the article's allegedly false suggestion that he had essentially no connection to 49er players after 1989. The article stated that plaintiff's connections to the 49ers were limited "primarily" to a few weeks in 1989, but that he "gave some former patients and colleagues the impression he had ongoing and extensive relationships" with the 49ers. The article quoted plaintiff as saying that he had "done Montana a lot," and later explaining that he had fitted Montana for orthotics and once taken care of an ingrown toenail. The article did not report plaintiff saying anything else about treating 49ers, apart from fitting them with orthotics at their training facility one day a week for a few weeks in 1989.

Plaintiff's declaration is silent on the extent of his involvement with 49er players after 1989. He presented no evidence on the subject other than a ledger of payments for orthotics listing four payments received from 49ers in July and September of 1990. It thus appears from the evidence that the article was correct insofar as it stated or implied that plaintiff had no ongoing and extensive relationships with 49ers after 1989. Plaintiff did not make a contrary showing and thereby failed to carry his burden on the motion to strike.

### (4) 49er Team Podiatrist

Plaintiff contends that the article falsely implied that he held himself out as having been the 49er team podiatrist. The article reported in this regard that: a medical professional who worked with plaintiff "either heard it [that plaintiff had been the team podiatrist] or heard him say it"; plaintiff was listed as the team podiatrist in an expert witness directory; the directory said that the information came from plaintiff; plaintiff said that the directory "made a mistake"; and plaintiff denied telling "anyone" that he had been team podiatrist. In his declaration against the Newspaper's motion plaintiff did not reaffirm his blanket denial as reported in the article; he merely stated that he "did not tell *patients*" that he had been the team podiatrist. (Italics added.) By this statement, which we assume was carefully worded, plaintiff does not deny holding himself out as the 49er team physician to persons other than patients, including fellow professionals, expert witness directories, radio talk show hosts, et cetera. Plaintiff thus failed to show that the allegedly false implication was not substantially true.

### (5) "Wall of Fame"

Plaintiff argues that the article falsely implied that he put signed photos of athletes on his walls to mislead patients. Insofar as it appears from the

evidence on the motion to strike, the article fully and fairly reported all of the facts bearing on plaintiff's intentions in this regard.

In his declaration, plaintiff said that he treated all of the athletes pictured; he is quoted to the same effect in the article. Plaintiff declared that the photos all had "custom signatures," and that he did not purchase any of the photos he displayed; the article similarly described the athletes pictured as "thanking the podiatrist for taking good care of them," and accused "a doctor (from another state)," not plaintiff, of buying autographs for display.

Most importantly, plaintiff has not disputed the article's account of what he told the reporter about the photos and the impression they made. In the article, he acknowledged an understanding that patients might have been misled into thinking that he had operated on the displayed athletes, but said that if patients got that misimpression it was their own fault for not asking specific questions. His reported statements were that: when he told patients he had treated all the athletes pictured, he did not mean he had performed surgery on them; when he was asked how he had treated the athletes, he admitted fitting most of them with supports; and, while patients sometimes "got excited" by the pictures, if they erroneously assumed from seeing them "that I did a lot of foot implants, they should have asked." Thus, even if the article could, as plaintiff argues, be taken to imply that he intentionally sought to mislead patients with the photos, that implication arose entirely from undisputed facts rather than any editorializing on the part of the Newspaper, and appellant cites no authority making the alleged implication actionable under those circumstances.

### (6) Gist of the Article

Plaintiff has also failed to make a prima facie case that the article's gist was not substantially true. It is undisputed that some patients and former colleagues got the impression that plaintiff had ongoing, extensive relationships with the 49ers, and it is not effectively disputed that he had essentially no connection with 49er players after 1989. Plaintiff does not deny initially telling the reporter that he had "done Montana a lot," and later admitting that he had only fitted Montana for orthotics and helped him once with an ingrown toenail. Plaintiff does not deny the article's report that he exaggerated his work with athletes when trying to land a position with the Sacramento Kings basketball team, a job that, in his words, would have given him a "a big, big marketing benefit." It is undisputed that, as the article stated, plaintiff testified in an Arizona case that he was still receiving consulting calls from the Warriors basketball "team[]" in 2001, when he had in fact not received a call from that team for many years. The article went down a list of athletes plaintiff claimed as clients, who when contacted had nothing good, or

nothing at all, to say about plaintiff; only one, Tim Hardaway, even confirmed that plaintiff had fitted him for orthotics. Plaintiff filed no testimonial from any athlete in opposition to the motion to strike, only a ledger of sums paid for orthotics. Given all of what plaintiff does not dispute or effectively controvert, it appears to be substantially true, on the record of this case, that he did in fact exaggerate his relationships with famous athletes to market his practice as the article charged.

(7) *100 Percent Success Rate*

This leaves only the article's allegedly false statement that plaintiff "ha[d] boasted of his 100 percent success rate." In his declaration plaintiff denied ever promising a 100 percent success rate to patients. Former patient Daniel Williams declared in support of the motion that when he went to plaintiff with a heel spur problem, plaintiff told him that "he had a surgery that only he performed that was 100% effective." Thus, while the article appeared to say that plaintiff had claimed without qualification to be infallible, the evidence on the motion showed that this claim may have been made, if at all, as to only one surgical technique. Since no professional, however skilled, is infallible, plaintiff might conceivably have been exposed to "ridicule" or "injure[d] . . . in his occupation" (Civ. Code, § 45 [defining "libel"]) if he were thought to have boasted of a 100 percent success rate. However, this one statement alone is not actionable.

In *Partington v. Bugliosi* (1995) 56 F.3d 1147, plaintiff Partington, an attorney, sued the defendant for falsely implying in a book that he had poorly represented a client in a murder case. After determining that none of the book's allegedly false implications was actionable, the court turned to Partington's argument that a passage in the book was factually inaccurate, and found "the factual misstatements if any are, in the circumstances of this case, of minor importance. . . . Courts have consistently rejected attempts to base damage claims upon minor factual errors when the gist of the work, taken as a whole, cannot serve as the basis for a defamation or false light claim. . . . We must evaluate Partington's final claim in light of the general picture which exists independent of the statement on which the claim is based. If, as Partington himself contends, *all* of the other contested statements—which we hold protected—would lead a reader to believe that he represented his client poorly, the additional item (even assuming it includes factual errors) will not in any way affect the reader's view of Partington. The light in which this remaining claim puts Partington is precisely the light in which he has already been put by material that is protected by the First Amendment. Under these circumstances, the additional example of which Partington complains cannot support a false light action." (*Id.* at p. 1161, fn. omitted.)

We reach the same conclusion for the same reason here on the allegedly false report of the 100 percent success rate boast. The gist of the article, as we have said, was that plaintiff solicited patients by exaggerating his professional experience. The alleged boast was at most a minor instance of this behavior among many others reported at greater length in the article, and as such would not have affected the reader's view of plaintiff. Since, as we have concluded, the gist of the article cannot serve as the basis for a defamation claim, neither can the minor error alleged as to the passing reference to the boast. (*Partington v. Bugliosi, supra,* 56 F.3d at p. 1161.)

### D. *Discovery*

Plaintiff contends that the court erred in denying his motion for leave to conduct discovery. (See § 425.16, subd. (g) [for good cause shown court may permit discovery after filing of motion to strike].) The ruling is reviewed solely for an abuse of discretion. (*1-800 Contacts, Inc. v. Steinberg, supra,* 107 Cal.App.4th at p. 593.)

A request for discovery in opposition to an anti-SLAPP motion should be determined with reference to the issues raised in the motion. (*The Garment Workers Center v. Superior Court* (2004) 117 Cal.App.4th 1156, 1162 [12 Cal.Rptr.3d 506].) Here, for example, plaintiff argues that discovery should have been granted to reveal what the reporter said to Craig before Craig made his allegedly slanderous statements. Plaintiff submits that, in the absence of such discovery, it must be assumed that, when Craig made the comments, "he was fully aware that if he claimed not to remember [plaintiff] and not to have needed foot or ankle treatment, he would contribute to the impression that [plaintiff] was a liar and a fraud." However, evidence of what the reporter told Craig was not reasonably calculated to shed any light on the matters at issue, namely, whether Craig recalled his isolated contacts with plaintiff many years earlier, or on what he considered to constitute a "relationship" with plaintiff. It is argued that discovery was necessary on plaintiff's alleged status as a public figure, but that is an issue on which plaintiff prevails without discovery. It is also argued that discovery was needed as to the status of the BPM proceedings on which the Newspaper's privilege argument was based, but plaintiff, again, has the better of that argument without having to marshal any additional facts. Plaintiff further argues that discovery should have been granted in connection with his claim against Bonds, but that claim is untenable because of plaintiff's failure to deny Bonds's assertions, not because of any failure to grant discovery.

Denial of the discovery request was neither prejudicial nor an abuse of discretion.

E. *Appeal No. A108923*

In his appeal from the order awarding attorney's fees to Bonds and the Newspaper, plaintiff argues only that, if the granting of the motions to strike is reversed, the fee orders must also be reversed because defendants will no longer be the prevailing parties. Since we are affirming the ruling on the motions to strike, there is no cause to disturb the fee award.

## III. CONCLUSION

The order granting the motions to strike and denying discovery, and the order awarding attorney's fees, are affirmed.

Sepulveda, Acting P. J., and Rivera, J., concurred.