Filed 12/21/22

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| CHAD BISHOP,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>THE BISHOP'S SCHOOL,<br><br>    Defendant and Appellant;<br><br>RON KIM,<br><br>    Defendant and Respondent. | D079827<br><br><br><br>(Super. Ct. No. 37-2020-00043758-CU-DF-CTL) |

APPEALS from an order of the Superior Court of San Diego County, Carolyn M. Caietti, Judge. Affirmed in part, reversed in part, and remanded with directions.

Edward F. O'Connor for Plaintiff and Appellant.

Liebert Cassidy Whitmore, Mark H. Meyerhoff and Nicholas M. Grether for Defendant and Appellant The Bishop's School and for Defendant and Respondent Ron Kim.

The Bishop's School (the School) terminated Chad Bishop's (Bishop) employment as a teacher for the School after it became aware of a text exchange between Bishop and a former student. Bishop filed a lawsuit

asserting a breach of contract claim against the School and defamation claims against the School and Ron Kim, the Head of the School, based on the termination letter they sent to Bishop and a statement Kim made that was published in the student newspaper. Defendants filed a special motion to strike the first amended complaint as a strategic lawsuit against public participation (SLAPP) as well as a demurrer. The trial court granted defendants' anti-SLAPP motion as to the defamation claims but denied it as to the contract claim against the School. The court also overruled the School's demurrer to the contract claim.

Bishop timely appealed the anti-SLAPP ruling. On cross-appeal, the School challenges the court's order denying anti-SLAPP protection for the contract claim. In its briefing on appeal, the School also seeks a writ of mandate directing the trial court to sustain its demurrer to the contract claim. We conclude that (1) defendants did not meet their burden to show that Bishop's allegations regarding the termination letter, which supports the defamation claim, or the termination itself, which supports the contract claim, involve protected activity; (2) defendants met their burden to show that Kim's statement was protected activity, and Bishop failed to show that the defamation claim as based on that activity had minimal merit; and (3) without having filed a writ petition, there is no basis for the School to seek writ relief from the court's order overruling its demurrer ruling on the contract claim. We therefore affirm in part and reverse in part the trial court's order and remand the matter with directions.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Background*

Bishop was employed as a teacher at the School for 16 years. In March 2019, Bishop and the School entered into a contract for the School to employ Bishop as an English teacher for the 2019–2020 academic year.

In September 2019, Bishop and defendant Kendall Forte, a 19-year-old former student of the School who had graduated in June 2019, exchanged text messages characterized by the parties as "flirtatious." Bishop and Forte exchanged the following text messages:

> "[Bishop:] Did you try the book? If it's too much spark note the chapters that aren't about Oscar.

> "[Forte:] HAHAHAH lol I haven't started[.] [¶] I'm drinking margs rn Chad

> "[Bishop:] I just got back from Mexico. Might have had my share. Glad you're keeping busy though.

> "[Forte:] Chad sit on my face[.] [¶] OMG MY FRIEND SENT THAT

> "[Bishop:] I didn't realize we had that kind of relationship. [Man shrugging emoji]

> "[Forte:] Do we tho?

> "[Bishop:] I can't figure out how either of us would benefit from that. I'm way to [*sic*] heavy.

> "[Forte:] I'm into dad bods

> "[Bishop:] I had [*sic*] one of the daddest possible bods. [¶] Finish those margs and get to reading. Remember my advice about the spark notes.

> "[Forte:] Margs be finished[.] [¶] And more than happy . . . have a dadbod[]. [¶] Not that I haven't noticed

> "[Bishop:] That's definitely the margs talking.

> "[Forte:] Daddddddyyy[.] [¶] I'm just speaking my mind

> "[Bishop:] On the off chance you're being serious I'm all ready to try so [*sic*] sexting. This is a photo of me getting

3

out of the shower this morning.  [picture of movie character 'Fat Bastard']

"[Forte:] Chad I'm serious and I thought it's been obvious from over the years [three tongue emojis]

"[Bishop:] You're definitely not serious but I appreciate the compliments.  And the few moments of excitement this text chain has brought me.  [¶]  Now get back to your friends.  Shake off those margs and make some appropriately aged young mans day.

"[Forte:] Omg Chad I'm serious[.]  [¶]  There a reason I would visit ur office everyday

"[Bishop:] I'm seriously at a loss for words.  [¶]  Also I still don't believe you.  [Man shrugging emoji] see why I never got laid in high school?  [¶] . . . [¶]

"[Bishop:] I think maybe the problem is all those times you said I gave you Santa vibes.  [Santa face emoji]

"[Forte:] Believe me[.]  [¶]  Let me be yo elf

"[Bishop:] Hahaha.  We can have this conversation again sometime without the margs.  If you tell me the same again I'll be honestly flattered.

"[Forte:] Flattered or down?

"[Bishop:] [Man shrugging emoji]

"[Forte:] That's like not an answer

"[Bishop:] The correct answer is that you're too young and my student and . . . and that's the only answer you're going to get from me over text.

"[Forte:] [Disliked 'The correct answer is that you're too young and my student and . . . and that's the only answer you're going to get from me over text.']

"[Bishop:] Don't give me that dislike.  I'm pretty sure you already know the answer to your question anyway.

"[Forte:] Why wouldn't you give me a real answer over text like we r the duo

"[Bishop:] Read your book Kendall. :-)"

The School and Kim learned about the text message exchange between Bishop and Forte from one of the School's current students. Forte had posted an altered version of the texts on social media, and the School received communications from concerned parents about the incident.

Kim met with Bishop soon after he received a copy of the text exchange, and the School then placed Bishop on administrative leave. Five days later, Kim again met with Bishop and informed him that the School was terminating his employment, effective immediately. Later that day, Kim sent Bishop a termination letter explaining the basis for the School's decision. The letter stated that the School had terminated Bishop's employment "for good cause" because he had "violated the School's policies and conduct expectations, failed to abide by prior guidance and directives from the School, brought discredit to [himself,] and breached the trust necessary for [him] to remain a Bishop's teacher." The letter further stated: "Your behavior also demonstrates exceedingly poor judgment. . . . [¶] . . . [¶] Your behavior violates the Fundamental Standard of The Bishop's School, has brought disrepute to both you and Bishop's, and impairs your usefulness and ability to perform the duties of a faculty member at Bishop's. Your behavior has damaged the trust that students, parents, and the School, expect of you as a faculty member at The Bishop's School."

In December 2020, after Bishop filed his original complaint, Kim made a statement to the School's student-run newspaper, which published an article about Bishop's lawsuit. The newspaper article quoted Kim as follows: "Mr. Kim declined to comment on aspects of the case, saying, 'We are committed to the safety and well-being of all students past and present. Out of respect for the privacy of our community, it is not the School's practice to

5

share specific information about our students, alumni, parents, staff, or faculty.' "

B. *The First Amended Complaint, Demurrer, and Special Motion to Strike*

In January 2021, Bishop filed a first amended complaint against the School for breach of contract and against the School and Kim for defamation.[1] Bishop alleged that the School's termination of his employment was a breach of his contract with the School. He also alleged that the letter of termination the School and Kim sent to him contained false and defamatory statements about Bishop's conduct that were intended to and did harm his reputation, including by making it impossible for Bishop to obtain employment as a teacher. Bishop further alleged that Kim's statement to the School's student newspaper was false, defamatory, made with malice, and caused him damage.

Defendants filed a demurrer to and special motion to strike pursuant to Code of Civil Procedure section 425.16,[2] known as an anti-SLAPP motion, against the entire complaint. In the demurrer, they argued that Bishop's contract claim failed because he did not identify a provision of the employment agreement that was breached, and his defamation claims failed because he did not identify specific defamatory language, the letter was not published, and the challenged statements were truthful as well as privileged. In the anti-SLAPP motion, defendants argued that all of Bishop's claims were based on speech and conduct implicating matters of public interest, including protecting children from inappropriate conduct from a teacher and

---

[1] Bishop also asserted a defamation claim against Forte, but that claim is not at issue in this appeal.

[2] All further statutory references are to the Code of Civil Procedure.

6

maintaining the necessary integrity and trust among the School and the School's teachers, parents, students, and staff. Defendants asserted that because Bishop could not establish a probability of prevailing on his claims, they must be stricken under the anti-SLAPP statute. In support of the anti-SLAPP motion, defendants submitted a declaration from Kim, screenshots of the text exchange, the School's employment agreement with Bishop, portions of the School's Employee Handbook, the termination letter, and the December 2020 student newspaper article containing Kim's quote.

Bishop, in opposition to the demurrer, argued that he had sufficiently stated a cause of action for breach of contract and defamation. He opposed the anti-SLAPP motion on several grounds, including that the challenged speech was merely informational and could not be viewed as contributing to a discussion, debate, or controversy, as required to claim anti-SLAPP protection. Bishop maintained that even if the speech was protected by the anti-SLAPP statute, he had demonstrated that the statements in question were defamatory and untrue, he was required to self-publish the termination letter, the letter was not privileged, and his termination was a breach of contract. In support of his opposition to the anti-SLAPP motion, Bishop submitted a declaration relaying his version of the events at issue and an e-mail from a former student.

C. *Trial Court's Ruling*

The trial court granted defendants' anti-SLAPP motion as to the defamation claims, denied the School's anti-SLAPP motion as to the breach of contract claim, overruled the School's demurrer as to the contract claim, and found the demurrer to the defamation claims moot as a result of its ruling on the anti-SLAPP motion.

7

In deciding the anti-SLAPP motion, the court explained that its analysis involved a two-step process:  "First, the defendant must establish that the challenged claim arises from activity protected by C.C.P. section 425.16.  [Citation.]  Second, if the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success."

At the first step, the court concluded that the School's termination letter and Kim's comments to the newspaper both constituted protected activity under section 425.16, subdivision (e)(4), which covers "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  Specifically, the court found that "the termination letter was a result of an inquiry into Plaintiff's conduct of texting a former student, which was brought to the School's attention by another student and parents, and had caused concern among students, parents and staff members."  Because the "text exchange between Plaintiff, a teacher at the School, and Forte, a recently-graduated student of the School, had been shared with current students, other alumna, parents and others in the School's community . . . and were sexual in nature[,] . . . the letter implicated public interest, including protecting children from inappropriate conduct by a teacher."  The court determined that "Kim's statement to the school newspaper similarly constituted speech in connection with an issue of public interest of keeping the School's students safe."  The court also considered "what functional relationship exists between the speech and the public conversation about the matter of public interest," concluding that there was some degree of closeness between the challenged statements and the asserted public interest.  It found that defendants' termination of Bishop's

8

employment through the termination letter meant that defendants had "participated in the discourse and served the interest of protecting child/student safety."

At the second step, the court concluded that Bishop had not met his burden to demonstrate that his defamation claims based on the termination letter and newspaper quote had the minimal merit required to proceed. Regarding the termination letter, the court found that Bishop failed to show that the letter had been published. Although " 'self-publication' of a defamatory statement may be imputed to the originator of the statement if there is a 'strong compulsion' to publish the defamatory statement and the publication is foreseeable," the court stated that Bishop had not provided evidence of defendants publishing the letter or confirmed that he republished the letter himself. Regarding Kim's newspaper quote, the court concluded that Bishop failed to show that the quote was false, defamatory, or had a natural tendency to injure or cause special damage.

The court found that Bishop had, however, met his burden to demonstrate that his breach of contract cause of action against the School had minimal merit for purposes of the anti-SLAPP motion. Bishop had shown that he performed under the contract, the School breached the contract by terminating his employment, and he was damaged as a result. The court also overruled the School's demurrer to Bishop's contract claim. It found defendants' demurrer to his defamation claims moot in light of its ruling on the anti-SLAPP motion.

Bishop timely filed an appeal of the trial court's order granting the anti-SLAPP motion to strike his defamation claims. The School cross-appeals the court's order denying its anti-SLAPP motion to strike Bishop's breach of contract claim. The School also challenges the order overruling its demurrer

9

to the contract claim and seeks a writ of mandate directing the court to issue an order sustaining the demurrer.

DISCUSSION

I

California's anti-SLAPP statute authorizes a special motion to strike any claim "against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue . . . , unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) Subdivision (e) of section 425.16 sets forth four categories of protected activity, only one of which is at issue here: Subdivision (e)(4) protects "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(1)–(4).)

A. *Standard of Review*

We review de novo an order granting or denying an anti-SLAPP motion. (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067 (*Park*).) We must first determine whether the defendant has established that the challenged claim arises from activity protected under section 425.16, meaning that the activity itself forms the basis for the claim. (*Ibid.*; *id.* at p. 1062; *Balla v. Hall* (2021) 59 Cal.App.5th 652, 671 (*Balla*).) Courts should analyze "each act or set of acts supplying a basis for relief, of which there may be several in a single pleaded cause of action—to determine whether the acts are protected[.]" (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1010 (*Bonni*).)

10

" 'If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success.' " (*Balla*, *supra*, 59 Cal.App.5th at p. 671, citing *Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).) Our review at this second step is similar to our review of a ruling on a summary judgment motion. (*Baral*, at p. 384.) We accept the plaintiff's evidence as true and consider the defendant's evidence only to determine whether it defeats the challenged claim as a matter of law. (*Id*. at p. 385.) Claims with at least minimal merit may proceed. (*Bonni*, *supra*, 11 Cal.5th at p. 1009.)

B. *Step One of the Anti-SLAPP Statute*

The Supreme Court recently clarified that section 425.16, subdivision (e)(4)'s catchall provision calls for a two-part analysis. (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 149 (*FilmOn.com*).) In other words, under the catch-all provision, step one of the process of reviewing an anti-SLAPP ruling itself contains two steps. "First, we ask what 'public issue or [ ] issue of public interest' the speech in question implicates—a question we answer by looking to the *content* of the speech. [Citation.] Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest. It is at the latter stage that *context* proves useful." (*Id*. at pp. 149–150, italics added.) We apply *FilmOn.com*'s two-part test to evaluate whether Bishop's allegations regarding his termination, the termination letter, and Kim's comments to the newspaper are covered as protected activity under section 425.16, subdivision (e)(4).

1. *Content of the Activity*

*FilmOn.com*'s "first step is satisfied so long as the challenged speech or conduct, considered in light of its context, may reasonably be understood to

implicate a public issue, even if it also implicates a private dispute." (*Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1253.)  In determining what constitutes a public issue, courts consider various factors, including "whether the subject of the speech or activity 'was a person or entity in the public eye' or 'could affect large numbers of people beyond the direct participants' [citation] . . . and whether the activity 'occur[red] in the context of an ongoing controversy, dispute or discussion' [citation] or 'affect[ed] a community in a manner similar to that of a governmental entity' [citation]." (*FilmOn.com*, *supra*, 7 Cal.5th at pp. 145–146.)

The content of the speech and conduct here—student safety and well-being—implicates a matter that affects a large number of people beyond the direct participants, including all current and former students at the School, their family members, and the School's staff.  The safety and well-being of students and children is plainly an issue of public interest.  (See *Hicks v. Richard* (2019) 39 Cal.App.5th 1167, 1176 (*Hicks*) [providing schoolchildren with an appropriate education and protecting them from abuse, bullying, and harassment are issues of public interest]; *Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 465–468 [safety in youth sports is an issue of public interest]; *Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1547–1548 [protecting children from predators and protecting minors in church youth programs are matters of public interest].)  The challenged speech and conduct involve this public interest. Bishop's first amended complaint alleges that he was terminated despite a lack of written policies and training regarding social contact with former students; the termination letter presented a false picture of Bishop as a "predatory teacher" and was motivated by defendants' desire to be viewed as intolerant of "immoral or improper" conduct regarding students and former

students; and Kim's quote to the newspaper implied that "it was necessary to fire Bishop for the safety and well-being of students past and present." Bishop's declaration in opposition to defendants' anti-SLAPP motion provides further support that the challenged claims implicate student safety. He explained that the termination letter inaccurately described Bishop's past conduct as causing parents to be concerned, involving "inappropriate touching," and being part of a pattern of personal misconduct directed at female students. His declaration also noted that Kim's quote in the newspaper article stated that he "was fired to 'protect students.'" We therefore find that Bishop's termination, the termination letter, and Kim's quote to the newspaper implicate an issue of public interest and thus satisfy the first inquiry under *FilmOn.com*.[3]

 2. *Context of the Activity*

*FilmOn.com's* second inquiry requires us to determine whether a functional relationship exists between the speech in question and the public conversation about the issue of public interest. It is not sufficient that the speech merely " 'refer to a subject of widespread public interest; the statement must in some manner itself *contribute* to the public debate.' " (*FilmOn.com*, *supra*, 7 Cal.5th at p. 150, citing *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 898, italics added.) In conducting this inquiry, we "must consider the particular context of the speech, including the speaker's identity; the 'purpose' of the speech; the nature of the audience and the intended

---

[3] Because we find that the issue here is one "of interest to the public at large" rather than a limited portion of the public, we agree with defendants that they need not demonstrate, as Bishop argues, that the speech in question "occur[ed] in the context of an ongoing controversy, dispute or discussion." (*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 119.)

audience; and the 'timing' and 'location' of the communication." (*Murray v. Tran* (2020) 55 Cal.App.5th 10, 30 (*Murray*), citing *FilmOn.com*, at pp. 140, 143–144, 154.) The context surrounding each challenged activity—the termination, termination letter, and newspaper quote—is different, so we review each one separately to determine whether defendants have met their burden.

### a. Termination Letter

First, Bishop argues that the trial court erred by concluding that the termination letter is entitled to anti-SLAPP protection. We agree. The court summarily concluded there was " 'some degree of closeness' between the challenged statements and the asserted public interest" and that "[b]y terminating [Bishop]'s employment through the termination letter, Defendants participated in the discourse and served the public interest of protecting child/student safety." Although it is true the termination letter contains statements about an issue of public interest, defendants have not shown that the statements *furthered or contributed to* a public discussion of this issue. Nor did the trial court undertake any analysis of the context of these statements as required under *FilmOn.com*.

Defendants assert that the trial court impliedly and correctly found that the termination letter contributed to the public debate because: (1) it was the result of an inquiry into Bishop's conduct, which was brought to the School's attention by another student and caused concern among students, parents, and staff members; and (2) the text exchange between Bishop and the former student had been shared with current students, other alumna, parents, and others in the School's community. But these facts support only the conclusion that the issue is one of public interest, which is not the focus of the second inquiry. Instead, the question "at this step of the anti-SLAPP

14

motion analysis is whether the letter contributed to the public debate, or furthered the discourse, on these issues." (*Hicks*, *supra*, 39 Cal.App.5th at p. 1177.) Unlike in *Hicks*, the answer here is no.

A review of the speaker, audience, purpose, and timing and location of the termination letter demonstrates that it was written by an employer, to an employee, with the purpose of privately communicating an employment decision. (See *Murray*, *supra*, 55 Cal.App.5th at p. 34, citing *FilmOn.com, supra*, 7 Cal.5th at p. 146.) There is no allegation or evidence that any member of the public—or anyone other than Bishop himself—received this letter. Nor is there any indication that defendants intended for any person other than Bishop to read the letter. (See *Murray*, at pp. 31–34 [defendant failed to show that e-mails to various individuals about plaintiff's alleged dental malpractice were protected under section 425.16, subdivision (e)(4) where he presented no evidence that he wanted the message to be communicated to patients or other members of the public or believed the message would be conveyed to the public].) In *Hicks*, by contrast, the allegedly defamatory letter was written by the chair of the school board and other concerned parents, it was sent to authorities outside the school and the local parish, and its purpose was to prompt these outside authorities to investigate and act on the allegations contained within the letter—a goal that was ultimately achieved. (*Hicks*, *supra*, 39 Cal.App.5th at p. 1177.) The context was thus quite different. Here, "the only reasonable conclusion is that these statements were made solely for *private purposes*," without contributing to the public discourse, and therefore do not constitute protected activity. (*Murray*, at pp. 34, 36.)

15

b. Kim's Newspaper Article Quote

Bishop similarly argues that the trial court erred by failing to apply the appropriate anti-SLAPP analysis to Kim's comments to the student newspaper. He contends that the comments do not qualify for anti-SLAPP protection because Kim's newspaper interview was merely informational and did not constitute participation in a public conversation regarding an ongoing matter of public interest because the School had already fired Bishop at that point. Defendants contend that the trial court correctly found that Kim's newspaper quote constituted speech in connection with the issue of public interest of student safety and is entitled to anti-SLAPP protection because there was some degree of closeness between the comments and the issue of public interest in question. We agree with defendants.

Bishop alleges that Kim made the following comment to the School's student newspaper when asked about Bishop's lawsuit: "We are committed to the safety and well-being of our students past and present." We have already determined that student safety and well-being is a matter of public interest, and we now find that Kim's comment contributed to the public discussion of this issue. The context surrounding the quote compels this conclusion: Kim made the statement to someone interviewing him on behalf of the newspaper; he did so with the knowledge that his statement would likely be published in the newspaper to an audience of the School's students, staff, and potentially parents or others in the community; and his purpose was to communicate defendants' position regarding student safety and well-being. (See *FilmOn.com*, *supra*, 7 Cal.5th at p. 146; *Murray*, *supra*, 55 Cal.App.5th at p. 34.) Kim's quote is therefore entitled to anti-SLAPP protection.

16

### c. Bishop's Termination

The School argues on cross-appeal that (1) the trial court properly found that Bishop's breach of contract claim, based on his termination, arose from speech protected under the anti-SLAPP statute, but (2) the court should have also found that Bishop could not establish that the School breached the contract. We disagree with the first contention, so we need not reach the second.

As the Supreme Court has explained, "a claim is not subject to a motion to strike simply because it contests an action or decision that was . . . thereafter communicated by means of speech or petitioning activity. Rather, a claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." (*Park, supra,* 2 Cal.5th at p. 1060.) Bishop's complaint demonstrates that his contract claim is based not on speech or petitioning activity, but rather on defendants' termination of Bishop's employment, which was thereafter communicated by means of speech. He alleges that he was called into a meeting with Kim and "informed that his position with the school was to be terminated immediately" and that the "termination was a direct breach of his contract." Terminating a teacher's employment for a particular reason—here, the School's opinion that the teacher has poor judgment and violated the employee handbook—"is not the same thing as making a public statement to that effect." (See *Bonni, supra,* 11 Cal.5th at p. 1021.) Our inquiry therefore turns on whether the School's conduct (terminating Bishop's employment) advanced its " '*ability* to speak [or petition] on matters of public concern.' " (*Id.* at p. 1022, citing *Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 897).) We conclude that it did not.

17

In *Bonni*, the Supreme Court held that "a causal link" between a disciplinary decision and speech on an issue of public interest does not necessarily mean the decision advances the decision-maker's ability to speak on the issue. (*Bonni*, *supra*, 11 Cal.5th at p. 1022.) There, the hospitals argued that physician disciplinary decisions furthered the hospitals' speech and petitioning rights on patient safety. (*Id*. at p. 1021.) The Supreme Court rejected this contention, concluding that the hospitals' suspension and eventual termination of a physician's hospital privileges were not entitled to anti-SLAPP protection because they did not advance the hospitals' ability to speak on patient safety in any substantial way: "Suspension or no, the Hospitals were perfectly free to express views about [the physician's] competence." (*Id*. at p. 1022.) The same is true here. Regardless of whether the School chose to terminate Bishop's employment, it was free to express its views on student safety and well-being (and in fact did so, as we have explained). (See also *Verceles v. Los Angeles Unified School Dist*. (2021) 63 Cal.App.5th 776, 790, fn. 6 [rejecting school district's argument that its decision to place teacher on leave while investigating his alleged assault of a student was expressive conduct entitled to anti-SLAPP protection because it communicated the message that the district would safeguard its students].) The School's employment decision did not itself advance its ability to do so. We therefore conclude that Bishop's termination is not protected by the anti-SLAPP statute.

In sum, we find that neither Bishop's allegations regarding the termination letter, which supports his defamation claim against defendants, nor the termination itself, which supports his breach of contract claim, are entitled to protection under section 425.16, subdivision (e)(4). Bishop's allegations regarding Kim's newspaper quote, however, are entitled to

18

protection.  We therefore proceed to the second step of the anti-SLAPP analysis to determine whether Bishop's defamation claim based on that statement has " 'at least "minimal merit." ' " (*Bonni*, *supra*, 11 Cal.5th at p. 1009.)

C. *Step Two of the Anti-SLAPP Statute*

Because we find that the only claim arising from protected activity is Bishop's allegation that defendants are liable for defamation based on Kim's statement published in the student newspaper in December 2020, the burden shifts to Bishop to establish a probability he can prevail on this defamation claim.  We conclude that he has not done so.

A claim for defamation requires:  (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage.  (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720 (*Taus*).) "A statement is not defamatory unless it can reasonably be viewed as declaring or implying a provably false factual assertion." (*Carver v. Bonds* (2005) 135 Cal.App.4th 328, 344, citing *Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 385 (*Franklin*).)  Whether a statement declares or implies a provably false assertion of fact is generally a question of law to be decided by a court.  (*Franklin*, at p. 385.)

The trial court found that Bishop failed to show that the quote was false, defamatory, or had a natural tendency to injure or cause special damage.  Bishop contends that the trial court's analysis of the merits of his defamation claim was "wrong," but he does not explain what that error was as it relates to Kim's newspaper quote.  The affirmative burden lies with Bishop at this stage, yet he makes no attempt to explain the defects in the trial court's conclusion, leaving us "to 'guess' how [he] believes the trial court erred." (*Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37

19

Cal.App.4th 855, 869.) More importantly, he fails to clearly describe what evidence was sufficient to demonstrate a likelihood of success on the merits of his defamation claims. Bishop was required to convince us, by developing his arguments, stating the law, and calling out relevant portions of the record, that the trial court committed reversible error. (See *ibid.*) His failure to do so justifies rejection of his argument on this basis alone.

In any event, Bishop's arguments are unavailing. Looking to the declaration Bishop submitted in support of the opposition to the anti-SLAPP motion, which is the only evidence he presented, he references the newspaper quote twice: (1) "When he fired me, Kim told me I had a history of inappropriate behavior and he needed to fire me to protect the students. He said the same in an article published by the school on the internet in the Fall of 2020"; (2) "It is also common practice to 'google' potential candidates and Kim's online article explaining I was fired to 'protect students' is there for all to find." But Kim made no such statements to the newspaper, at least not on the record before us. The article itself stated that Kim specifically "declined to comment on aspects of the case," then quoted a general statement by Kim that the School was "committed to the safety and well-being of all students past and present."

Bishop contends on reply that Kim's "statement was made in the context of a question inquiring about the reason that Plaintiff was terminated" and, "[b]y strongly associating the Plaintiff's firing with the need to protect students, past and present, Kim performed deliberate, purposeful defamation." But again, Bishop does not present evidence of facts in support of this assertion. For example, nothing in the record indicates that the interviewer even asked Kim why Bishop was terminated. This leads us to

conclude that Bishop has failed to carry his burden under the second prong of the anti-SLAPP statute.

Even if Bishop had presented evidence showing that the implication of Kim's statement was Bishop had been fired to protect the students, "it appears very doubtful that such a statement properly could be viewed as *a statement of fact* (which could support a defamation action), rather than *an expression of opinion* (which cannot)." (*Taus, supra*, 40 Cal.4th at p. 720; see also *McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 116–117 (*McGarry*).)  In *McGarry*, another anti-SLAPP case instructive here, plaintiff was a university head football coach who sued the university and its officials for defamation based on statements made in a newspaper article and at a parent meeting after his employment was terminated. (*McGarry*, at pp. 102–103.)  At the meeting, a parent asked about plaintiff's termination: " 'Was it criminal or morality dealing with this school?  Yes or No?  [¶] . . . [¶]  If you say yes, I can live—I'll back you 100 [percent].  If you say no, your timing's bad and I can't back you [any] more.  Criminal or morality?' "  Defendant responded: " 'I can say that [plaintiff] was not involved to our knowledge in any criminal activity.' " (*Id*. at p. 105.)  Plaintiff contended that defendant's statement was defamatory because it implied that he had engaged in immoral behavior.  The court rejected this argument: "[Defendant]'s statement did not *expressly* assert that [plaintiff]'s employment had been terminated because of immoral behavior.  Moreover, even assuming we accepted [plaintiff]'s claim that [defendant] impliedly asserted he had engaged in some unspecified immoral behavior, the statement still is incapable of being interpreted as implying a *provably false* assertion of *fact*." (*Id*. at p. 116.)  An implied assertion from Kim that Bishop engaged in some unspecified behavior that presented a threat to student safety is no different.

21

We therefore find that Kim's statement was not reasonably susceptible of being interpreted to imply a provably false assertion of fact.

Because Bishop has presented no evidence that Kim made a false and defamatory statement, he cannot show a likelihood of success on the merits. We therefore conclude that the trial court properly granted defendants' anti-SLAPP motion as to Kim's newspaper quote. Accordingly, paragraph 19 must be stricken from Bishop's first amended complaint in its entirety, and paragraph 27 must be stricken to the extent it incorporates paragraph 19 by reference.

## II

The School also purports to seek a writ of mandate directing the trial court to sustain its demurrer to Bishop's breach of contract claim by way of cross-appeal. We deny this request.

As the School concedes, an order overruling a demurrer is not directly appealable. (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 912–913 (*San Diego Gas*), citing §§ 904.1, 906.) Rather, it is reviewable on appeal from the final judgment, which is presumed to be an adequate remedy. (*San Diego Gas*, at p. 913.) There are exceptions to this rule, and courts may review an order overruling a demurrer by means of extraordinary writ where certain circumstances are present. (*Ibid.*; *id.* at p. 913, fn. 17.) The School argues that one exception—the need to prevent a needless and expensive trial and reversal—applies here. (See *id.* at p. 913, fn. 17.)

The proper vehicle through which to raise this argument, however, is by way of a separate petition for a writ of mandate, not on appeal. The School did not file a writ petition. Although appellate courts may treat an improper appeal as a petition for writ of mandate where "unusual

circumstances" exist (*Olson v. Cory* (1983) 35 Cal.3d 390, 401), we decline to exercise that discretion here. The School has not presented any unusual circumstances to warrant our treating the appeal as an extraordinary writ, and we find that none exist.

## DISPOSITION

The order granting in part and denying in part the anti-SLAPP motion is affirmed in part and reversed in part. The matter is remanded to the trial court with directions to vacate the order and enter a new order granting the anti-SLAPP motion in part, by striking paragraph 19 of the first amended complaint in its entirety and striking paragraph 27 to the extent it incorporates paragraph 19 by reference, and otherwise denying the motion. The parties shall bear their own costs on appeal.


BUCHANAN, J.

WE CONCUR:



HUFFMAN, Acting P. J.



O'ROURKE, J.